IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-30352 |
| | ) | (Chapter 11) |
| DRAIN SERVICES INC. | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**REPORT PURSUANT TO 11 U.S.C. § 1188**

Comes now Drain Services Inc. ("Drain Services" or the "Debtor"), by and through undersigned counsel, pursuant to Section 1188 of Title 11 of the United States Code, and reports as follows:

### I. Introduction

This is a small business case that, for myriad reasons, has received ample attention in the month since it was filed. The Debtor operates a unique service-centric business in the corporate and municipal plumbing space; the Debtor's operations in bankruptcy have been, for better or worse, just as unique. At core, though, Drain Services is a generally healthy, income-producing business that serves a vital role in the communities in which the entity operates. And while the Debtor's cash flow may be punctuated by certain erratic eccentricities, the company is a well-regarded and oft-called upon component of the regional plumbing ecosystem that can – and will – produce ample revenues on a forward-looking basis.

In light of some of the aforementioned early case anomalies, Drain Services has committed to filing a plan of reorganization in the coming days and to hopefully confirming that plan in just over a month's time. Even by the hyper-accelerated measures of Subchapter V, this promises to be an unusually quick case, with there being some tacit acknowledgement that while Drain Services is well suited to honor repayment rigors on a forward-looking basis, the Debtor may not

1

be ideally suited for protracted operations as a debtor-in-possession. In anticipation and recognition of these realities, informal efforts have already been undertaken with an eye toward forming what will hopefully prove to be a consensual plan of reorganization.

## II. Reorganizational Efforts

At core, Drain Services has three groups of creditors: (i) Choice Bank ("Choice"); (ii) the United States of America (the "United States"); and (iii) trade creditors. There is palpable nuance within the third category, as some claims are disputed, some claims are nominal, and some claims are rife with ambiguity. But a candid overview of this case is assuredly premised on the reality that a plan of reorganization addressing the claims of Choice and the United States, in a responsible manner, is likely – albeit not assuredly – to garner a consensual confirmation.[1]

While Choice is yet to file a formal proof of claim, the bank's exhibits for first day hearings suggest a gross indebtedness of $294,103.45, before accounting for attorneys' fees that, in turn, may form a part of the secured obligation. By the time a confirmation hearing is held, at least $35,000.00 will have been paid against this obligation (albeit with a portion applied to those legal fees), reducing the sum the Debtor will need to retire over the life of the plan while also furnishing adequate protection for the ongoing use of cash collateral. Almost assuredly, the remaining sum will need to be paid over the full five year life of a plan, amortized at an interest rate that is in accord with the mandates of the Bankruptcy Code.[2] Even then, it is possible the final payment to

---

[1] There is one other secured creditor, with a somewhat novel security interest pegged to a single piece of equipment. While not discussed at length herein, the Debtor is aware of its obligation to address this creditor's claim through a plan of reorganization, and to do so in a manner consistent with the rigors of the Bankruptcy Code.

[2] Though the Bankruptcy Code contemplates a plan period of as short as three years, this case will necessitate a five year plan by virtue of the simple reason that the Debtor will need that full timespan to pay secured claims in a manner that does not cripple Drain Services' operational cash flow.

2

Choice may have to come in the form of a secured short term promissory note, payable over an ensuing series of years, pursuant to Section 1123(b)(5) of the Bankruptcy Code. Such a provision would permit extension of the runway for retirement of the debt in accord with the Debtor's need to use forward-looking revenues for operational purposes, albeit at the expense of committing the Debtor to payments over a longer-than-typical time horizon.

Counsel for the Debtor and counsel for Choice have been in frequent contact throughout this case. While those discussions have certainly not been exemplars of the unanimity of common thought, there is an enduring confidence such dialogue will be productive as more fully engaged. Though the Debtor and Choice appear to have certain fundamentally divergent views of historic events and current equities, the bankruptcy process offers a generous set of tools that may utilized to mend this otherwise-fraught relationship.

The United States, by contrast, has two claims, each of which will be paid in a markedly straightforward manner. The first claim is derivative of taxes due to the Internal Revenue Service and, per the Bankruptcy Code, the priority portion of this obligation must be satisfied within five years of the October 2, 2023 petition date. Though the delta between a five year arc commencing on the petition date, and a five year arc commencing on the effective date of a plan, is likely to be minimal, the distinction will be of some import in light of the tight nature of the Debtor's finances. This claim is prone to receive a marginally-disproportionate share of payments until paid in full, with there being some backloading of other claims.

The second government claim emanates from a disaster relief loan, secured against the Debtor's assets and payable at a below-market interest rate over the course of thirty years. Almost assuredly, Drain Services will simply commit to honoring its obligations under this debt instrument for the full thirty year term; it would be impracticable (and economically unwise) to endeavor to

accelerate payment, and the subject obligation was not in default at the time this case was commenced.

Counsel for the Debtor and counsel for the United States have had productive discussions about potential plan treatment for these obligations. Those discussions ought not be mistaken for any sort of even vaguely binding commitments (nor would such be appropriate, given the non-solicitation provisions of Section 1125 of the Bankruptcy Code). The discussions do, however, form a good faith belief that a consensual plan – at least vis a vis the debt owed the federal government – may well be attainable *sub judice*.

This leaves only the third category of debts, owed chiefly to trade creditors (albeit also inclusive of any unsecured, non-priority claim of the Internal Revenue Service, should there be such a claim). It is not likely this group of creditors will bode particularly well under a plan of reorganization, though there is some hope – even if fleeting – of a small pool of funds being made available to general unsecured creditors. While the Debtor relishes the idea of being able to furnish some consideration to these creditors, the Debtor is also aware of the equitable optics that would stem from providing monies to unsecured, non-priority creditors whilst simultaneously stretching out an obligation to Choice over a period in excess of five years.

None of the creditors in this vague grouping have, as of yet, appeared through counsel in this case. The Section 341 meeting of creditors was held earlier today and attended only by the Subchapter V trustee, counsel for the United States Trustee, counsel for Choice, counsel for the United States, the Debtor's representative, and undersigned counsel. Should any of these creditors subsequently emerge in a proactive manner, however, Drain Services will certainly embrace an opportunity to meaningfully engage their views on various options and potential routes, consistent with the spirit of a Subchapter V bankruptcy.

**III.    Conclusion**

A plan in this case will be docketed before the Section 1188 status conference is held, and the plan may well speak louder to any progress, *vel non*, than this interim report. But Drain Services remains determined to maximize a return to its creditor body, while ensuring the entity is able to exist in a financially healthy manner that allows for the ongoing support of the community's plumbing needs and the ongoing satisfaction of long-term debt service obligations (including a 30 year horizon on a note held by the United States). An irregular and partially seasonal cash flow will no doubt make this a challenge, but it is a challenge the Debtor looks forward to addressing in the coming days and weeks.

Respectfully submitted,

Dated: November 2, 2023     By:     /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of November, 2023, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

5