**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In re:

**Drain Services, Inc.**                    **Bankr. No. 23-30352**

                    **Debtor**                    **Chapter 11**

---

### ACTING US TRUSTEE OBJECTIONS TO
### DRAIN SERVICES, INC. SUBCHAPTER V PLAN

---

The Acting United States Trustee (UST) objects Drain Services, Inc.'s Subchapter V Plan of Reorganization (Plan") (Doc. No. 69) In support of her objections, she states the following:

1.      The UST has standing to object under 28 U.S.C. § 586 and 11 U.S.C. § 307.

2.      The Plan states, at the Article 4 discussion of Class 3 general unsecured claims, that the class is presumed to reject the Plan.    Therefore, confirmation of the Plan will be under 11 U.S.C. §1191(b) as a non-consensual plan.  *See also In re Double H Transportation, LLC*, 603 F. Supp.3d 468, 475 (W.D. Texas 2022) (citing Section 1126(g) and holding that when unsecured creditors are paid nothing, the class is deemed to reject the plan by operation of law).

**Substantive Objections**

3.      The UST takes the position that the Plan discriminates unfairly and is not fair and equitable to Class 3 in violation of Section 1191(b), is filed in bad faith in violation of Section 1129(a)(2) and may not be feasible in violation of Section 1129(a)(11).

4.      Under the Plan, the general unsecured class gets nothing.  The Plan estimates that non-insider general unsecured claims total $ 48,228.58.

1

5.    The projections, filed at Docket 71, project a reserve of $48,740 in 2024 up to $92,487.77 in 2028, for a total profit retention of $350,403.15 over the course of the Plan.   The Plan violates Section 1191(b) and (c) because the Plan fails to provide all projected disposable income of the Debtor to be received in the 3-year or such longer period fixed by the Court to be applied to make payments under the Plan.  *See* 11 U.S.C. § 1191(c)(2)(A).

6.    When a subchapter V plan does not obtain acceptance of all classes of creditors, the Plan may only be confirmed under Section 1191(b), which replaces the cram-down provision of Section 1129(b).   *See In re Peal Resources*, LLC, 622 B.R. 236, 252-52 (Bankr. S.D. Texas (2020); . *In re Moore Properties of Person County, LLC*, 68 Bankr. Ct. Dec. (CRR) 123, 2020 WL 995544, at *5 (Bankr. M.D. N.C. 2020)   Section 1191(b), (c) and (d) provides in relevant part:

> **(b) Exception.**--Notwithstanding <u>section 510(a)</u> of this title, if all of the applicable requirements of <u>section 1129(a)</u> of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
> **(c) Rule of construction.**--For purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:
>
> **(1)** [N/A]
>
> **(2)** As of the effective date of the plan-
>
> **(A)** the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

2

**(B)** the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

(3) [N/A]

**(d) Disposable income.**--For purposes of this section, the term "disposable income" means the income that is received by the debtor and that is not reasonably necessary to be expended—

    **(1)** [n/a]

    **(2)** for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.

11 U.S.C. § 1191(b), (c) & (d). The Debtor bears the burden of meeting the requirements of Section 1191. *In re Double H Transportation,* 603 F. Supp at 475; *In re Lapeer Aviation, Inc.,* 2022 WL 7204871, * 3 (Bankr. E.D. Mich. Oct. 12, 2022).

7.      In this case, there is no question that the Plan discriminates unfairly because the general unsecured creditor class is receiving nothing, while a reserve of $350,403.15 over the life of the Plan is being retained by the insiders. In evaluating whether a plan discriminates unfairly, a bankruptcy court adopted the following analysis:

> When analyzing whether a plan discriminates unfairly, a court must determine whether (1) there is a legally acceptable rationale for such discrimination, and (2) whether the discrimination is necessary in light of the rationale. *In re 203 N. LaSalle St. Ltd. P'ship,* 190 B.R. 567, 585–86 (Bankr. N.D.Ill.1995). The question of unfair discrimination is a "horizontal comparative assessment applied to similarly situated creditors (here unsecured creditors) where a subset of those creditors is classified separately, does not accept the plan, and claims inequitable treatment under it." *In re Tribune Co*., 972 F.3d 228, 232 (3d Cir. 2020).

3

*In re Channel Clarity Holdings, LLC*, 2022 WL 3710602, *14 (Bankr. N.D. Ill July 19, 2022).

8.      In addition to the discriminate unfairly requirement, "[t]he absolute priority rule has been replaced with the "fair and equitable" requirement to protect dissenting unsecured classes similar to those requirements found in applicable Chapters 12 and 13 cases and individual Chapter 11 cases."  *In re Pearl,* 622 B.R. at 266.   A plan is "fair and equitable" "if it commits all of the debtor's disposable income for the entire term so the plan to making plan payments..." *In re Channel Clarity*, at *15.   Given the lack of developed case law under subchapter V, courts have followed cases on "disposable income" under chapter 12 and below-median chapter 13 cases to provide guidance, given the similarity in the definitions.  *In re Cesaretti*, 2023 WL 3676888 (Bankr. D. Nev. May 10, 2023);  *In re Hyde*, 2022 WL 2015538 * 9 (Bankr. E.D. LA June 6, 2022

9.      In the Chapter 12 context, the Eighth Circuit has frowned upon the accumulation of large reserve funds:

> The determination of what constitutes disposable income is a fact-intensive inquiry into whether debtor has "income which is in excess of that *reasonably* required for maintenance and continuation of [its] farming operation from one year to the next." *In re Coffman,* 90 B.R. 878, 885 (Bankr.W.D.Tenn.1988). Chapter 12 debtors must turn over disposable income during the course of their farm operations under a plan. *See In re Kuhlman,* 118 B.R. 731 (Bankr.D.S.D.1990). Creditors may also require a final disposable income determination at the end of the plan, prior to discharge, to ensure that debtor did not "accumulate an unreasonably large reserve of funds that would provide a windfall at the time of discharge." *In re Gage,* 159 B.R. 272, 280 (Bankr.D.S.D.1993); *see Rowley,* 22 F.3d at 194.

*In re Broken Bow Ranch, Inc*. 33 F.3d 1005, 1008-09 (8th Cir. 1994).

10.      In the present case, the Plan projections at docket 71 propose that the Debtor keep profits in excess of the non-insider general unsecured debts each year over the five years.   The amount is unreasonable on its face.    If the Debtor's income and expense projections are that inaccurate or unpredictable, the Plan is alternatively not confirmable under Section 1129(a)(11)(feasibility) because the figures are not reliable.

11.      In their chapter 13 case, the insiders of the Debtor, Kevin and Caitlyn Cameron, testified in favor of paying general unsecured creditors under the Plan.  The Camerson's filed a chapter 13 case on October 14, 2023 (BK 23-30369).  A section 341 meeting was held on December 5, 2023.   The recording of the meeting reveals that Mr. Camerson testified that he thought the reserve line on Document 71 was to pay unsecured creditors but admitted that he did not know why Debtor's counsel listed it.    He also indicated that he intended for the chapter 11 Plan to pay unsecured creditors, and he testified that the income and expense figures on the projections were accurate in his view and were "slightly" inflated to account for an increase in costs over time.[1] *See* Att. Ex. 1 (Partial Transcript).

12.      The good faith requirement of Section 1129(a)(3) requires a totality of circumstances consideration: "'Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *Est. of Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),*

---

[1] The partial transcript was prepared by an employee of the Vogel Law Firm, which represents Tony Hamilton, an unsecured creditor in the case, and the transcript covers the testimony regarding the projections in the Plan, which starts at about 25 minutes into the recording.   The undersigned attorney listened to the recording, and believes this unofficial transcription is a good faith translation of the recording.  The undersigned requested an official transcript for Tuesday but the expedited nature may be cost prohibitive. The UST will make a recording available to any party in interest who requests it.   The testimony regarding the Plan balloon payment is approximately 22 minutes into the recording.

764 F.2d 406, 408 (5th Cir. 1985). The court should consider "the totality of the circumstances surrounding establishment of a Chapter 11 plan keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *Pearl Res.*, 622 B.R. at 260."" *In re Double H Transportation*, 603 F. Supp.3d at 477; *Todeschi v. Juarez In re Juarez)*, 603 B.R. 610, 626 (9th Cir. BAP 2019).

13.    To the extent, the Cameron's change their testimony at the confirmation hearing and insist on a reserve, the "reserve" on the Docket 71 projections to the Plan will allow the insiders to pay themselves and their personal debts ahead of the Drain Services creditors in bad faith under Section 1129(a)(3).    The Camerson's chapter 13 plan proposes monthly payments and a lump sum payment of $66,000 on October 2028 to pay $191,413.43 to the chapter 13 unsecured creditors.  Mr. Camerson testified at the meeting of creditors that he had no idea why the lump sum payment was in the Plan and that he had no idea how it would be paid.  *See* Att. Ex. 1 (Chapter 13 Plan in BK 23-30369, at Art. 2.4).    The obvious source would be the reserve shown on Docket 71.

14.    In addition, the projections at Docket 71 reflect that payroll will total $200,000 in 2024 and increase thereafter over the life of the Plan.  Mr. Cameron has previously testified that there is only 1 other employee, who is paid on an hourly basis.  Based on Mr. Cameron's prior testimony, he receives the bulk of that payment at approximately $11,000 per month.

15.    In this case, it has been disclosed that the insiders took $20,000 out of the Debtor on the eve of filing the petition (which transfer is not addressed in the Plan) and that the Debtor failed to follow the cash collateral budget during the case.  These factors with the proposal for the insiders to take a generous salary from the Debtor and retain $350,403.15 of profits for their own benefit at the expense of the unsecured creditors is evidence of bad faith.

6

**Procedural Objections**

16.    <u>Introduction, Plan Overview</u>   The Plan should start the paragraph by explaining
Section 1191(a) and (b).  The Plan should address up front that this will be a non-consensual plan
since Class 3 is deemed to reject the plan.

Example of language:

Under Section 1191 of the Bankruptcy Code, a plan may be confirmed either

consensually or non-consensually.  To be confirmed consensually, all classes must accept

the Plan.  Because the Plan is not making any distribution to Class 3 general unsecured

creditors, Class 3 is deemed to reject the plan, and the Debtor will seek to confirm the

plan as non-consensual under Section 1191(b).   Under a non-consensual plan, the Debtor

must demonstrate that the plan does not discriminate unfairly and is fair and equitable

with respect to each class of claims or interest that is impaired or has not accepted the

plan.

17.    <u>Introduction, Liquidation Analysis</u>.   The explanation of the chapter 7 liquidating
costs is overstated and biased to the interests of the insider over the estate.    The attorney fees
for a contested motion to convert is speculative and would be potentially nullified because the
administrative expense would exist in the chapter 11 case as well.   The chapter 7 trustee attorney
fee cost is speculation and would likely be commensurate with the corresponding chapter 11
expense.  The loss of work in process is an accounting value and not a liquidation cost.   The
Plan's liquidation analysis notwithstanding, the UST would agree that the Debtor has
consistently testified that the equipment value ($881,7121 of total value of $1.6 million) is
valued at acquisition value.  The Debtor also testified that the uncollectible A/R were inverted

and that is overstated by about $150,000 (Debtor listed $450K as uncollectible but testified the correct figure is $600K).

18.    Introduction iii(c):   The Plan should disclose the value of the insurance claim.

Article 3

19.    3.02:  The Plan should add the sentence:   Post-petition, the Subchapter V Trustee shall continue to apply for all fees in accordance with Sections 330 and 331.

20.    3.02:  The Plan should estimate the outstanding administrative expenses.

21.    3.04:  Secured Tax Claim   The Plan should change all references of "disbursing agent" to "Subchapter V Trustee"

Article 4

22.    Class 2 combines two separate claims by two separate creditors (Choice and Bank of the West) with two separate payments into one class.  The claims should be separately classified, as per 11 U.S.C. 1122.

Article 6

23.    6.01:  The Plan should list leases to be assumed specifically.  Voters will not have access to CM/ECF unless they hire counsel.

Article 7

24.    First paragraph:  The Plan should change the reference from "disbursing agent" to "Subchapter V Trustee".    Section 1194(b) designates the Subchapter V Trustee as making payments, unless the plan provides otherwise.

25.    Last paragraph:  The Plan should change all references from "disbursing agent" to Subchapter V Trustee or note at the beginning, "If the Subchapter V Trustee is serving as the disbursing agent…"

8

26.     The Plan is confusing as to how payments will be made.  The Plan provides:

| Classification | Creditor | Payment | Payor |
|---|---|---|---|
| Unclassified | IRS Secured | 1184.76 | Sub V Trustee |
| Class 1 | SBA | 2562 | Debtor to pay |
| Class 2 | Choice | 5,763.88 | Sub V Trustee |
| Class 2 | BOW | 344.36 | Sub V Trustee |
| Class 3 | GUSC | 0 | Presumed to reject |
| Class 4 | Insider | 0 | |
| | Total | 9,855 | |

The amortization schedules are monthly. Section 3.04 states the IRS will be paid

quarterly by the Subchapter V trustee.  The SBA is being paid by the debtor.   Class 2 provides

for monthly payments to Chase and BOW.   Article 7 begins by stating that the Debtor will pay

the Subchapter V trustee monthly.   The last paragraph uses the vague language about the

Subchapter V trustee making distributions under the plan as he deems most fit.  The Plan must

set a firm schedule for the Subchapter V trustee.   It seems it would be most cost effective for the

Class 2 creditors to be paid quarterly with the IRS secured payment.

<u>Article 8</u>

27.     Section 8.06:  In the last sentence, all references to "disbursing agent" should be

changed to subchapter V trustee.  The UST cannot appoint a disbursing agent, only a Subchapter

V Trustee.

28.     Section 8.09.  The Plan proposes to pay unsecured creditors nothing.  Any

unclaimed funds should be disbursed to the next class and not sent to a law clinic.

<u>Article 9</u>

28.     The Plan should insert discharge language in the Plan. Voters do not know what

the Bankruptcy Code means without consulting counsel.

9

Example

<u>Discharge</u>.  The Court shall grant the Debtor a discharge pursuant to 11 USC § 1192 of all debts that arose prior to the Petition Date in this case, except any debtor (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.
Discharge all occur –

    a. If the Plan is confirmed under 11 USC 1191 a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan;  or

    b. If the Plan is confirmed under 11 USC 1191(b), the Court shall grant a discharge upon the completion of the plan payments to Class 4.

WHEREFORE, the UST requests that the Court grant her objections herein and such other relief as appropriate.

Dated: December 7, 2023

MARY R. JENSEN
Acting U.S. Trustee Region 12

 /s/ Sarah J. Wencil
Sarah J. Wencil
Trial Attorney
IA Atty # 14014
Office of the United States Trustee
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 334-1350

10

Exhibit 1

Gieseke:        I call the case of Kevin and Caitlyn Cameron, Case Number 23-30369. Please raise your right hands. Do you swear to tell the truth, the whole truth, and nothing but the truth?

K. Cameron:     Yes.

C. Cameron:     Yes.

Gieseke:        Please state your full names for the record.

K. Cameron:     Kevin Michael Cameron.

C. Cameron:     Caitlyn _____ Cameron.

Gieseke:        Attorney Sara Diaz is here on behalf of the Debtors. We do have some creditors making an appearance. Do you guys just want to note your appearances on the record?

Stanley:        Caren Stanley on behalf of Tony Hamilton.

Schroeder:      John Schroeder for Choice Financial Group.

Gieseke:        All right. No other creditors are appearing today. Kevin and Caitlyn, what is the best phone number that you two can be reached at?

K. Cameron:     For me, it would be 701.936.3365.

Gieseke:        Sorry. 3365, Correct?

K. Cameron:     Correct.

Gieseke:        All right. I just need one number. That's all I'll need. You two are married, correct?

K. Cameron:     Yes.

C. Cameron:     Yes…

[01:00] – [24:56]

Gieseke:        …Caren, do you have questions for the debtors at this time?

Stanley:        Yeah. So, Mr. Cameron, you're taking an $11,000 a month salary out of the company. Is that correct?

K. Cameron:     That's correct.

Stanley:        How many other employees are there in the company?

K. Cameron:     One.

Stanley:          So between, who's the other employee?

K. Cameron:   His name is Tyler Englund.

Stanley:          Okay. And what does Tyler get paid?

K. Cameron:   He's at $30 an hour.

Stanley:          So, between the two of you, it's about $200,000, then, or, per year, or?

K. Cameron:   I don't know what his yearly ends up being. I have no idea what his gross is for the year.

Stanley:          So, I guess I got a little confused on: in the past few years, were there payments issued from the company to Mrs. Cameron?

K. Cameron:   Yeah, they would have come with our entire tax portfolio, I believe. Yes.

Stanley:          Okay, so were you getting distribution, I mean, were you getting salary the past few years? Or would that be…

K. Cameron:   No.

Stanley:          So you were previously getting a distribution from the company.

K. Cameron:   Correct.

Stanley:          But you didn't actually own part of the company?

K. Cameron:   It was, I don't the accountant, on what line they had it, as our draws that were being made. The payment I'm on now is about two months old, and it was formed on an average of what's been drawn out of the company over the years, and it was just calculated as part of our chapter V proceeding. So, this is, in twelve years, I've been on payroll for two months.

Stanley:          Okay. Was it always a consistent amount…

K. Cameron:   No.

Stanley:          …that you were taking, or?

K. Cameron:   No.

Stanley:          What was the determination for how much you got?

K. Cameron:   I, whatever is, I mean, I don't own anything, personally. So, whatever my investment or whatever our family needed is what I would draw off the company for the month.

2

Stanley:        You said that you thought the transfer of your 50% interest to Mrs. Cameron that happened in, I think it was, 2015?

K. Cameron:     In the range of 2014-16, somewhere in there. I don't remember exactly what year it was.

Stanley:        Who helped you do that? Or how did that paperwork come about? Did you have an attorney help you with that, or?

K. Cameron:     Yeah, our general counsel did that for us.

Stanley:        Who's your general counsel?

K. Cameron:     Asa Burke with Kaler Doeling.

Stanley:        Okay. So, he helped you transfer all of your interest over to Mrs. Cameron at that point.

K. Cameron:     Yes.

Stanley:        And you testified earlier that you said that the company at that point was solvent. So, did Caitlyn pay you anything for your 50% interest?

K. Cameron:     No.

Stanley:        So, what was the reason, then, for transferring it?

K. Cameron:     At the time, we were seeking commercial financing for the business, and I had personal credit issues at the time, and this is what we were suggested by our banker at the time to do, is for Caitlyn to take over ownership of the company as a responsible financier, I guess.

Stanley:        Were you being pursued by creditors at the time?

K. Cameron:     Possibly. I don't have those records readily available. I mean, I don't, it was quite some time ago, so I don't have that in front of me.

Stanley:        Did you have any lawsuits against you?

K. Cameron:     Again, I don't have that information in front of me from those years.

Stanley:        You just don't remember.

K. Cameron:     That was eight years ago. I don't remember.

Stanley:        In your, in the Subchapter V Plan, that's up, I take it both of you are familiar with that plan for the entity?

K. Cameron:     Yes.

3

Stanley:       Can I share my screen, Mike, or do you have that document I just emailed to you?

Gieseke:       Let's if I can. I'll make you a co-host and then you should be able to share. Does that work?

Stanley:       Sure. Does this document look familiar? This is the exhibit to your plan.

K. Cameron:    It does.

Stanley:       Okay.

K. Cameron:    It's in a slightly different format than what I had been working off of. It looks like it's been broken down on a yearly basis, and I've been used to looking at it on a weekly basis.

Stanley:       Okay. We talked about the payroll expense, the $200,00, the first line, that's you and, I think you said, Tyler, right?

K. Cameron:    Correct.

Stanley:       And does it set forth down here, like, you know, your plan expenses and it includes your plan payments set forth in that plan, and projected income. There's a miscellaneous reserve of $48,740 at the end. Is that right?

K. Cameron:    That is a new line item that has been generated with this format, and I'm not sure why Mack put that on there. I'm not sure what his computational method is, but that, we weren't working off of a reserve throughout our hearings. That's a new line item.

Stanley:       Okay, but did the expenses look correct?

K. Cameron:    So, I don't have, I was used to looking at this on a weekly basis, so this is, I mean, this is, I've seen this. I have seen that the data was transferred correctly from the weekly to this, and then projected out. So, I just don't have, I don't have what I was working off of in front of me to tell you, but, I mean, the numbers look accurate, yes.

Stanley:       But this is the plan that you filed.

K. Cameron:    Yes. So…

Stanley:       And the exhibit that was filed along with the plan, right?

K. Cameron:    Correct, yeah. So, I'm, without having, yeah. They look like they compute. Yes.

Stanley:       Okay. So, can you explain why the plan doesn't pay anything to unsecured creditors if there's almost $50,000 left over at the end for the year?

K. Cameron:    That's probably what it's for. I mean, without having Mack on the line to tell why he's got that line item on there, that's probably part of what is in his plan somewhere, is to pay unsecured creditors out of that.

| | |
|---|---|
| Stanley: | Okay. So, that's your understanding, that there would be some payment to unsecured creditors? |
| K. Cameron: | Absolutely. |
| Gieseke: | And maybe as a follow-up, Caitlyn is that your, as the owner of that company, is that your understanding, as well? |
| C. Cameron: | Yes, that would be my assumption. |
| Gieseke: | Okay. I just feel, and Caren's getting to the same point I am, here. I think one way or the other, if you have these additional profits, they either need to be paid out in that Subchapter V to the creditors in that case, and if the plan doesn't provide for that, then they need to be paid in to your unsecured creditors in this case, in your personal bankruptcy, okay? |
| K. Cameron: | That's fine with us. That's what we're trying to accomplish here, is make as many people whole as possible. |
| Gieseke: | Okay. Sorry, Caren. Go ahead if you have any additional questions. |
| Stanley: | So, these projections, though. Did you work with Mack on doing these projections? |
| K. Cameron: | Yes. |
| Stanley: | Do you think they're reasonable? |
| K. Cameron: | I do. We spent a lot of time figuring out what to use, just with how the markets are with labor and everything. We tried to apply, you know, somewhat conservative percentages, you know, 5% growth, 5% higher expenses, you know. It's kind of tough to predict what's going to happen in the future, but I think we were fairly conservative to accommodate for any sort of fluctuation moving forward. |
| Stanley: | Okay. And these aren't, I mean, you have to have a feasible, right? Like, to confirm your plan, it has to be feasible. So, these aren't, you know, high numbers for your income or something like, you think those numbers for income are what you can actually earn. |
| K. Cameron: | Yeah. We used, at least, I think it was like, three-years back factors. So, we used real-time data from how the company was operated to come up with this. |
| Stanley: | Okay. |
| K. Cameron: | But we didn't, this isn't really, the only reason it's any projection at all is to just to accommodate, like, market flux, but other than that, everything that we based it off of, the base itself was real-time data. So, even down to the quarter three of this year. So, they're, I think they're accurate, yeah. |

5

| Stanley: | Okay. And the expenses that you have in here, those are based on historical data, right? Like, they're not, are they inflated, or they're understated, or, I mean, are they pretty accurate? |
|---|---|
| K. Cameron: | The materials and some of the expenses are slightly inflated, just to cover supply chain issues that we don't know about, you know. Some of our material comes from across the country, so we did add a little bit of a factor in there, but I don't think it's any more than 5%. |
| Stanley: | Okay. |
| K. Cameron: | I mean, some of them are even as low as like 2%, just to maybe, maybe shipping costs go up one year, or something like that. But as far as the aggregate costs, though, they're 98-99% real-time. |
| Stanley: | And so, for like, equipment, is this just maintenance and/or, like, buying new equipment that is needed for the business? |
| K. Cameron: | Correct. |
| Stanley: | Okay. What's the T&E mean? |
| K. Cameron: | Travel and entertainment. We have a lot of job sites that are on the road, so this is a lot of hotel expenses, we don't, I've never paid out per diem, because we cover all the expenses on the road. So, that's covering meals for the crew, expenses for the crew, anything related to what it takes to get them to and from our job sites. We've got a 6-hour service radius around Fargo. |
| Stanley: | Okay. So, you think that the business has value in a going-forward basis, based on your projections and all your intentions. |
| K. Cameron: | Yes. |
| Stanley: | Okay. Thank you. I will also request a copy of the transcript. |
| Gieseke: | I can do that. All right. Can you end the screenshare? |
| Stanley: | Oh, sorry about that. |
| Gieseke: | Nope, no problem. Perfect. Just a few follow-up questions here and a few more things to go through. So, I did go through that payment schedule. You should discuss with your attorney that lumpsum payment, how it affects your plan and feasibility of your plan. The total amount that your plan calls for, in this case, is $321,000 plus the turnover of a portion of your tax refunds. Out of those funds, trustee's fees would be paid, attorney's fees would be paid, the secured claim of FCCU and the IRS would be paid, and the remainder would go to pay your unsecured creditors. Is that your understanding of the plan as it sits currently? |

6

K. Cameron:   Yes, other than that lumpsum payment, that all sounds accurate.

Gieseke:   Okay. A trustee's position is that you shouldn't gamble during your bankruptcy. If we see winnings on your tax returns or learn about them elsewhere, we would ask for the gross winnings. If we didn't get those funds, we would move to dismiss your case, so best advice is to not gamble. If your income decreases and you can't make your payments, contact your attorney to discuss your options. If your income increases significantly, and like we talked about, if you have any additional profits from the business, this also goes for Caitlyn's employment with Essentia, though, as well. If income increases, you need to let your attorney know about that. If you do become entitled to receive a windfall of property or money, including, but not limited to, inheritances and life insurance proceeds, make sure to let your attorney know so your attorney can disclose and discuss with the trustee, okay?

K. Cameron:   Okay.

Gieseke:   All right. Confirmation is scheduled for January 9th at 2:00 p.m. in Fargo. Only go to that hearing if your attorney tells you that you should attend. Okay?

K. Cameron:   Okay.

C. Cameron:   Okay.

Gieseke:   All right. Do you guys have any questions for me at this time?

C. Cameron:   No, thank you.

Gieseke:   All right.

K. Cameron:   No.

Gieseke:   No? All right. This ends this hearing.

Exhibit 2

(rev. 02.06.2023)

In re:

Debtor 1: Kevin Cameron

Debtor 2: Caitlyn Cameron
　　　　　　　(Spouse, if filing)

　　　　　　　　　　Debtor(s).

*In a joint case, Debtor means Debtors in this plan.*

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NORTH DAKOTA** | |
| **CHAPTER 13 PLAN** | |
| Case No.:　　23-30369 | |
| Dated:　　　November 28, 2023 | |
| Indicate if this is: | |
| _____ Amended Plan (pre-confirmation) | |
| _____ Modified Plan (post-confirmation) | |
| (1st, 2nd, etc.) | |

## Part 1. NOTICES

**To Debtor:** This form includes options that may be appropriate in some cases, but the presence of an option on the form does not indicate that the option is appropriate in your circumstances. You must provide for the treatment of all secured and priority unsecured claims in this plan. In addition, you must attach a liquidation analysis to this plan. A sample liquidation analysis is provided on the Bankruptcy Court website.
http://www.ndb.uscourts.gov

**To Creditors: Your rights may be affected by this plan. Your claim may be reduced, modified, or eliminated.** You should read this plan carefully and discuss it with your attorney if you retained one in this bankruptcy case. If you have not retained an attorney, you should consider consulting one.

If you oppose Debtor's treatment of your claim or any provision in this plan, you or your attorney must file an objection to plan confirmation before the deadline set by the Court. **The Bankruptcy Court may confirm this plan without further notice if no interested parties file objections to confirmation. See Local Rule 3015-2.**

**To Those Seeking Plan Disbursements from the Trustee: You or someone on your behalf must file a proof of claim to be paid by the Trustee.**

## NOTICE OF NONSTANDARD PLAN PROVISIONS, SECURED CLAIM LIMITATIONS AND LIEN OR SECURITY INTEREST AVOIDANCE:

Debtor must check a box next to 1.1, 1.2 and 1.3 to state whether the plan includes any of the following items:

| 1.1 | A limit on the amount of a secured claim based on the value of the collateral, which may result in a partial payment or no payment to the secured creditor (see Part 8 below) | ☐ Included | ☒ Not included |
|---|---|---|---|
| 1.2 | Avoidance of a judicial lien or nonpossessory, nonpurchase money security interest | ☐ Included | ☒ Not included |
| 1.3 | Nonstandard provisions included in Part 15 | ☒ Included | ☐ Not included |

## Part 2. DEBTOR'S PAYMENTS TO TRUSTEE

2.1  As of the date of this plan, Debtor has paid the Trustee $_____.

2.2  After the date of this plan, Debtor will pay the Trustee:

**$3,405.00** per month for **21 months** beginning in **November** of **2023.**

**$3,705.00** per month for **13 months** beginning in **August** of **2025.**

**$5,205.00** per month for **26 months** beginning in **October 2026**

For a total of **$255,000.00.**

The initial plan payment is due not later than 30 days after the order for relief (petition date).

2.3  The minimum plan length is ☐ 36 months or  ☒ 60 months from the date of the initial plan payment unless all allowed claims are paid in a shorter time.

2.4  Debtor will also pay the Trustee: **On or before the last month of the plan, October 2028, a lump sum payment in an amount sufficient to cover the liquidation value of the estate estimated to be $66,000.00.**

2.5  Debtor will pay the Trustee a total of **$321,000.00** Parts 2.1 + 2.2 + 2.4].

2.6  Debtor will provide the Trustee a copy of each income tax return filed during the plan term within 14 days after filing the return.  Debtor will treat income tax refunds as follows:

The debtor(s) shall send the Trustee each year during the Chapter 13 Plan copies of federal and state income tax returns at the time they are filed. The debtor(s) shall also promptly report to the Trustee the receipt of any federal and state tax refunds for the duration of this Chapter 13 case. The debtor(s) shall be entitled to retain the first $1,200 (single debtor or single tax return filer) or $2,000 (joint debtor or joint tax return filer), plus any earned income credit (EIC). Any remaining amounts shall be turned over to the Chapter 13 trustee as additional plan payments.

## Part 3. ESTIMATED PAYMENTS BY TRUSTEE TO CREDITORS AND TRUSTEE'S FEES:  Prior to confirmation of the plan and to the extent funds are available, the Trustee will make payments designated as Adequate Protection ("Adq. Pro.") under Parts 8 and 9 to creditors with claims secured by personal property. The Trustee will disburse all other funds following confirmation of the plan.

From available funds, the Trustee will pay only creditors for whom proofs of claim were timely filed. The Trustee is not required to retain funds for any claim for which a proof of claim was not timely filed and may disburse those funds to other claimants.

The Trustee may collect a fee of up to 10% of plan payments or **$32,100.00.** [Part 2.5 x .10].

If the court grants a creditor relief from stay to liquidate a piece of collateral listed in the plan, the Trustee will cease distributing payments toward the debt(s) secured by the collateral unless otherwise ordered by the Court.

## Part 4. EXECUTORY CONTRACTS AND UNEXPIRED LEASES (§ 365): Debtor assumes the following executory contracts or unexpired leases. Debtor will pay the payments that come due after the petition date directly to the creditors. Cure provisions, if any, are included in Part 7.  Those executory contracts and unexpired leases not expressly assumed below are deemed rejected on the date of plan confirmation.

|     | Creditor | Description of property |
|-----|----------|-------------------------|
| 4.1 | None     |                         |
| 4.2 |          |                         |

**Part 5. CLAIMS NOT IN DEFAULT:** Payments on the following claims are current as of the petition date. Debtor will pay the payments that come due after the petition date directly to the creditors. The creditors will retain their liens, if any.

|      | Creditor        | Description of property        |
|------|-----------------|--------------------------------|
| 5.1  | Bravera Bank    | 2020 Audi Q7                   |
| 5.2  | Loancare, LLC   | Homestead at 1131 Legion Ln W. |

**Part 6. HOME MORTGAGES IN DEFAULT (§§ 1322(b)(5) AND 1322(e)):** The Trustee will make the following payments necessary to cure defaults on claims secured only by a security interest in real property that is Debtor's principal residence. Debtor will pay the installment payments that come due after the petition date directly to the creditors. The creditors will retain liens. The Trustee will pay the allowed default amount.

|      | Creditor | Amount of default | Monthly payment | Beginning in mo./yr. | Number of payments | Remaining payments | + amount paid to date by Trustee (mod plan only) | Total payments |
|------|----------|-------------------|-----------------|----------------------|--------------------|--------------------|--------------------------------------------------|----------------|
| 6.1  | None     |                   |                 |                      |                    |                    |                                                  |                |
|      |          |                   |                 |                      |                    |                    | TOTAL:                                           |                |

**Part 7. CLAIMS IN DEFAULT (§§ 1322(b)(3) AND (5) AND 1322(e)):** The Trustee will make the following payments necessary to cure defaults on the following claims, at the interest rate listed below. Debtor will pay the payments that come due after the petition date directly to the creditors. The creditors will retain liens, if any. The Trustee will pay the allowed default amount.

|      | Creditor | Amount of default | Interest rate (if any) | Monthly payment | Beginning in mo./ yr. | Number of payments | Remaining payments | + amount paid to date by Trustee (mod plan only) | Total payments |
|------|----------|-------------------|------------------------|-----------------|-----------------------|--------------------|--------------------|--------------------------------------------------|----------------|
| 7.1  | None     |                   |                        |                 |                       |                    |                    |                                                  |                |
|      |          |                   |                        |                 |                       |                    |                    | TOTAL:                                           |                |

**Part 8. SECURED CLAIMS - AMOUNT IN PLAN CONTROLS (§ 1325(a)(5) CRAMDOWN):** Confirmation binds the creditors listed in this Part to the sum of the allowed secured claims listed below pursuant to 11 U.S.C. § 1327. The Trustee will pay the amount listed in the "Total Payments" column. Unless otherwise specified in Part 15, the creditors listed in this Part retain the liens securing their allowed secured claims to the extent provided under 11 U.S.C. § 1325(a)(5). The allowed unsecured portion of the claim, if any, will be treated as provided in Part 13. For secured claims filed by governmental units, the value of a secured claim listed in its proof of claim filed in accordance with Bankruptcy Rule 3012(c) supersedes any contrary amount listed below unless otherwise ordered by the Court.

|      | Creditor | Est. Claim amount | Allowed Secured claim | Int. Rate | Adq. Pro. (Check) | Begin-ning in mo./ yr. | Monthly payment | # of Pay-ments | Remaining payments | + amount paid to date by Trustee (mod plan only) | = Total payments |
|------|----------|-------------------|-----------------------|-----------|-------------------|------------------------|-----------------|----------------|--------------------|--------------------------------------------------|------------------|
| 8.1  | None     |                   |                       |           | ☐                 |                        |                 |                |                    |                                                  |                  |
|      |          |                   |                       |           |                   |                        |                 |                |                    |                                                  |                  |
|      |          |                   |                       |           |                   |                        |                 |                |                    |                                                  |                  |
|      |          |                   |                       |           |                   |                        |                 |                |                    | TOTAL:                                           |                  |

**Part 9. OVERSECURED CLAIMS AND SECURED CLAIMS EXCLUDED FROM § 506 (§ 1325 Hanging Paragraph):**

*Check one.*

☐ **None.** *If "None" is checked, the rest of Part 9 need not be completed or reproduced.*

☒ The claim(s) listed below was either:

(1)   incurred within 910 days before the petition date and secured by a purchase money security interest in a motor vehicle acquired for the personal use of Debtor,

(2)   incurred within 1 year of the petition date and secured by a purchase money security interest in any other thing of value, or

(3)   secured by property with value in excess of the claim.

The Trustee will pay the amount of the following allowed secured claims, at the interest rate set forth below. The following entries are estimates, <u>except for the interest rate.</u> Unless otherwise specified in Part 15, the creditors listed in this Part retain the liens securing their allowed secured claims to the extent provided under 11 U.S.C. § 1325(a)(5).

| | Creditor | Est. Secured Claim amount | Int. Rate | Adq. Pro. | Begin in mo./yr. | Monthly payment | # of Pay-ments | Remaining payments | + amount paid to date by Trustee (mod plan) | = Total payments |
|---|---|---|---|---|---|---|---|---|---|---|
| 9.1 | Internal Revenue Service | $20,050.56 | 8% | ☐ | 11/2023 | $600.00 | 1 | $19,584.23 | | $20,804.32 |
| | | | | | 12/2023 | $810.00 | 1 | $18,904.79 | | |
| | | | | | 01/2024 | $2,900.00 | 6 | $1,994.32 | | |
| | | | | | 07/2024 | $1,994.32 | 1 | $0.00 | | |
| 9.2 | FCCU | $61,239.98 | 6.97% | ☐ | 11/2023 | $600.00 | 1 | $60,995.68 | | $65,582.38 |
| | | | | | 12/2023 | $810.00 | 1 | $60,599.97 | | |
| | | | | | 01/2024 | $2,230.00 | 6 | $49,166.98 | | |
| | | | | | 07/2024 | $3,135.68 | 1 | $46,316.88 | | |
| | | | | | 08/2024 | $5,400.00 | 9 | $1,537.77 | | |
| | | | | | 04/2025 | $1,537.77 | 1 | $0.00 | | |
| | | | | | | | | | TOTAL: | **$86,386.70** |

**Part 10. PRIORITY CLAIMS (Not including claims under Part 11):** The Trustee will pay in full all allowed claims entitled to priority under § 507(a)(2) through (a)(10), including the following claims. The amounts listed are estimates.

| | Creditor | Est. Claim amount | Begin in mo./yr. | Monthly payment | # of payments | Remaining payments | + amount paid to date by Trustee (mod plan only) | = Total payments |
|---|---|---|---|---|---|---|---|---|
| 10.1 | Bulie Diaz Law Office | $7,500.00 | 11/2023 | $3,930.00 | 1 | $3,570.00 | | $7,500.00 |
| | | | 12/2023 | $3,570.00 | 1 | $0.00 | | |
| 10.2 | Internal Revenue Service | $1.00 | 04/2025 | $1.00 | 1 | $0.00 | | $1.00 |
| 10.3 | ND Tax Commissioner | $1.00 | 04/2025 | $1.00 | 1 | $0.00 | | $1.00 |
| | | | | | | | TOTAL: | **$7,500.00** |

**Part 11. DOMESTIC SUPPORT OBLIGATION CLAIMS:** The Trustee will pay in full all allowed domestic support obligation claims entitled to priority under § 507(a)(1), including the following claims. The amounts listed are estimates.

|      | Creditor | Est. Claim amount | Begin in mo./yr. | Monthly payment | # of payments | Remaining payments | + amount paid to date by Trustee (mod plan) | = Total payments |
|------|----------|-------------------|------------------|-----------------|---------------|--------------------|--------------------------------------------|------------------|
| 11.1 | None     |                   |                  |                 |               |                    |                                            |                  |
|      |          |                   |                  |                 |               |                    | TOTAL:                                     |                  |

**Part 12. SEPARATE CLASSES OF NONPRIORITY UNSECURED CLAIMS:** In addition to the class of unsecured claims specified in Part 13, there are the following separate classes of nonpriority unsecured claims. The Trustee will pay the following allowed nonpriority unsecured claims. All entries below are estimates, <u>except for the interest rate.</u>

|      | Creditor | Est. claim amount | Interest rate (if any) | Beginning in mo./yr. | Monthly payment | # of pay-ments | Remaining payments | + amount paid to date by Trustee (mod plan only) | = Total payments |
|------|----------|-------------------|------------------------|----------------------|-----------------|----------------|--------------------|--------------------------------------------------|------------------|
| 12.1 | None     |                   |                        |                      |                 |                |                    |                                                  |                  |
|      |          |                   |                        |                      |                 |                |                    | TOTAL:                                           |                  |

**Part 13. ALLOWED NONPRIORITY UNSECURED CLAIMS:** The Trustee will pay holders of allowed nonpriority unsecured claims the balance of all payments received by the Trustee and not paid under Parts 3, 6, 7, 8, 9, 10, 11, and 12. These claimants will receive their pro rata share of approximately **$191,413.43.** [Part 2.5 minus totals in Parts 3, 6, 7, 8, 9, 10, 11 and 12].

13.1  Debtor estimates that the total unsecured claims held by creditors listed in Part 8 are $_____.

13.2  Debtor estimates that the unsecured portion of the claims secured by surrendered collateral in Part 14 total:  $_____.

13.3  Debtor estimates that Debtor's nonpriority unsecured claims (excluding those in Parts 8, 12, and 14) total: $1,496,726.04

13.4  Total estimated nonpriority unsecured claims (excluding those in Part 12) are **$1,496,726.04** [Parts 13.1 + 13.2 + 13.3].

13.5  Projected percentage payment to nonpriority unsecured creditors (excluding those in Part 12) **10.82%**

**Part 14. SURRENDER OF COLLATERAL AND REQUEST FOR TERMINATION OF STAY:** Debtor surrenders the collateral securing the claims of the following creditors in satisfaction of the secured portion of the creditors' claims. To the extent the collateral does not satisfy a creditor's claim, the creditor will be treated as the holder of an unsecured claim after the creditor amends its proof of claim.  Any allowed unsecured claim resulting from the disposition of the collateral will be treated in Part 13 above.  Debtor requests that the automatic stay under 11 U.S.C. §§ 362(a) and 1301(a) be terminated as to the surrendered collateral on the date this plan is confirmed.

|      | Creditor | Legal Description (Real Estate) Description of Property (Chattel) |
|------|----------|------------------------------------------------------------------|
| 14.1 | None     |                                                                  |

Part 15. NONSTANDARD PROVISIONS: Placement of additional nonstandard provisions, as defined in Rule 3015(c), must be in this Part. Any nonstandard provision placed elsewhere in the plan is void.

| | SECURED CLAIMS OF DRAIN SERVICES, INC. AND DSI INVESTMENTS, LLC. |
|---|---|
| 15.1 | (a) **Choice Financial:** holds a first-priority mortgage against the real property owned by DSI Investments, LLC. and is fully secured.<br>(b) **Choice Financial:** holds a first-priority blanket lien on the assets, machinery, etc. of Drain Services, Inc.<br>(c) **Small Business Administration:** holds a second-priority blanket lien on the assets, machinery, etc. of Drain Services, Inc.<br>(d) **Bank of the West/BMO Harris Bank/Orion Financial:** holds a first-priority purchase money security interest on a Portaburst TB30 Gen2<br><br>Any payments received pursuant to this plan pursuant to Part 13 must be credited to the claims owed by Drain Services, Inc. and DSI Investments, LLC. |
| 15.2 | Debtors, post-petition, have extended funds to DSI Investments, Inc. to retain legal counsel to protect the real estate from foreclosure. This real estate is vital to the operation of Drain Services, Inc. and the viability of the Debtor's proposed plan through wages to Mr. Cameron. Debtors have included $2,500.00 of value to the liquidation value of this estate to offset the use of disposable income. |

## Part 16. SUMMARY OF ESTIMATED PAYMENTS:

| | Class of payment | Total Payments |
|---|---|---|
| 16.1 | Trustee's Fee [Part 3] | $32,100.00 |
| 16.2 | Home Mortgage Defaults [Part 6] | |
| 16.3 | Claims in Default [Part 7] | |
| 16.4 | Section 506 Secured Claims [Part 8] | |
| 16.5 | Non-Section 506 Secured Claims [Part 9] | $89,984.57 |
| 16.6 | Priority Claims [Part 10] | |
| 16.7 | Domestic Support Claims [Part 11] | |
| 16.8 | Separate Class of Unsecured Claims [Part 12] | |
| 16.9 | Nonpriority Unsecured Claims [Part 13] | $191,413.43 |
| 16.10 | TOTAL (must equal Part 2.5) | $321,000.00 |

Certification regarding nonstandard provisions:
I certify that this plan contains no nonstandard provisions except as placed in Part 15.

Signed: _____
Sara E. Diaz, Debtor's Counsel

Sara E. Diaz
Bulie Diaz Law Office
3523 45th St. S. Suite 102
Fargo, ND 58104
Phone: (701 298-8748
Email: sara@bulielaw.com

Signed: _____
Debtor 1: Kevin Cameron _____
Dated: Nov 29, 2023

Signed: _Caitlyn Cameron_____
Caitlyn Cameron (Nov 29, 2023 11:07 CST)
Debtor 2: Caitlyn Cameron _____
Dated: Nov 29, 2023

## Property Analysis for Kevin Cameron & Caitlyn Cameron

| Property | Value | Liens | Equity | Exempt | Unexempt |
|---|---|---|---|---|---|
| 1131 Legion Ln W | $400,000.00 | $279,277.00 | $120,723.00 | $120,723.00 | $0.00 |
| 1125 Legion Ln W and 1137 Legion Ln | $80,000.00 | $61,239.38 | $18,760.62 | $18,760.62 | $0.00 |
| Essentia Health Retirement Plan - 401K (Caitlyn) | $5,685.87 | $0.00 | $5,685.87 | $5,685.87 | $0.00 |
| 2020 Audi Q7 | $40,515.00 | $17,074.00 | $23,441.00 | $10,000.00 | $13,441.00 |
| Clothing - Clothing and wearing apparel | $2,000.00 | $0.00 | $2,000.00 | $2,000.00 | $0.00 |
| Household Goods - Couch, chair, entertainment centers (3), dressers (3), table with 8 chairs, 4 beds, end tables (4) | $4,350.00 | $0.00 | $4,350.00 | $4,350.00 | $0.00 |
| Household Goods - Toaster, Mixer, coffee maker, waffle maker, microwave, refrigerator, range, freezers (2), washer/dryer | $2,300.00 | $0.00 | $2,300.00 | $2,300.00 | $0.00 |
| Electronics - Televisions (3), DVD Player, 2 tables, 2 phones | $3,000.00 | $0.00 | $3,000.00 | $850.00 | $2,150.00 |
| Collectibles Of Value - Books (100) | $100.00 | $0.00 | $100.00 | $0.00 | $100.00 |
| Sports & Hobby Equipment - 1 Bicycle | $50.00 | $0.00 | $50.00 | $0.00 | $50.00 |
| Collectibles Of Value - DVDs (100), CDs (30) | $130.00 | $0.00 | $130.00 | $0.00 | $130.00 |
| Jewelry - Jewelry | $2,000.00 | $0.00 | $2,000.00 | $2,000.00 | $0.00 |
| Pet(s) - Dogs (3), Turtle, Cat, Fish (24) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Wex Health Inc. - Health Savings ending (Other (Credit Union, Health Savings, etc)) | $255.63 | $0.00 | $255.63 | $0.00 | $255.63 |
| Jewelry - Diamond Engagement Ring, 1.2ct VS1, with two Asscher cut diamonds weighing .55cttw. 14K White Gold 25% of estimated replacement valuation performed 4/13/23 | $3,987.50 | $0.00 | $3,987.50 | $0.00 | $3,987.50 |
| Other - Household power tools | $400.00 | $0.00 | $400.00 | $0.00 | $400.00 |
| Cash on Hand (Cash on Hand) | $500.00 | $0.00 | $500.00 | $0.00 | $500.00 |
| Change Jars (2)($100 each) (Cash on Hand) | $200.00 | $0.00 | $200.00 | $0.00 | $200.00 |
| Sanford Retirement Savings Plan (Caitlyn) | $132,315.57 | $0.00 | $132,315.57 | $132,315.57 | $0.00 |
| Term Life Insurance insuring Debtor, $5M face value, no cash value | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| BankNorth ending #9327 (Kevin), overdrawn (Checking Account) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| BankNorth ending #1683 (Caitlyn) (Savings Account) | $5,500.14 | $0.00 | $5,500.14 | $0.00 | $5,500.14 |
| Jewelry - 14K White Cold Custom Princess Cut Diamond men's eternity band; 12 bezel set princess cut diamonds weighing 2.23 cttw 25% of estimated replacement valuation performed 4/13/23 | $2,496.25 | $0.00 | $2,496.25 | $2,496.25 | $0.00 |
| Jewelry - Wedding Bands: (1) Palladium Men's Custom Black Diamond Band with 12 small diamonds weighing 1.92 cttw - ($2,387.50) (2) Two 14K white gold custom bands with 7 Asscher cut diamonds weighing .35 cttw ($1,562.50 each) 25% of estimated replacement valuation performed 4/13/23 | $5,512.50 | $0.00 | $5,512.50 | $3,503.75 | $2,008.75 |
| WEX Health Dependent Care Account (Other (Credit Union, Health Savings Account, etc)) | $4,036.60 | $0.00 | $4,036.60 | $0.00 | $4,036.60 |
| DSI Investments, LLC - sole asset: real estate utilized by Drain Services, LLC, - See Exhibit 1 | $158,100.00 | $0.00 | $158,100.00 | $0.00 | $158,100.00 |
| Drain Services, Inc. - See Exhibit 1 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Western State Bank ending #4707 (Caitlyn) (Checking Account) | $1,394.27 | $0.00 | $1,394.27 | $1,045.70 | $348.57 |
| BankNorth ending #9335 (Caitlyn) (Checking Account) | $12,636.92 | $0.00 | $12,636.92 | $2,013.86 | $10,623.06 |
| **Totals:** | Value | Liens | Equity | Exempt | Unexempt |
| | **$867,466.25** | **$357,590.38** | **$509,875.87** | **$308,044.62** | **$201,831.25** |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

IN RE:

Cameron, Kevin
Cameron, Caitlyn

CASE NO: 23-30369

**DECLARATION OF MAILING
CERTIFICATE OF SERVICE**

Chapter: 13

On 11/29/2023, I did cause a copy of the following documents, described below,

Chapter 13 Plan with Property Analysis

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice. com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R.Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 11/29/2023

/s/ Sara E. Diaz
Sara E. Diaz  06069
Attorney for Debtor
Bulie Diaz Law Office
3523 45th Street S. Suite 102
Fargo, ND  58104
701 738 1029
sara@bulielaw.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

IN RE:

Cameron, Kevin
Cameron, Caitlyn

CASE NO: 23-30369

**CERTIFICATE OF SERVICE
DECLARATION OF MAILING**

Chapter: 13

On 11/29/2023, a copy of the following documents, described below,

Chapter 13 Plan with Property Analysis

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document(s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 11/29/2023

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Sara E. Diaz
Bulie Diaz Law Office
3523 45th Street S. Suite 102
Fargo, ND  58104

USPS FIRST CLASS MAIL / ELECTRONIC NOTICE OF FILING. Parties listed below receive notice via First Class USPS Mail Service.
Parties with names struck through or labeled CM/ECF SERVICE were sent notice via First Class USPS Mail Service.

BANK OF THE WEST
2527 CAMINO RAMON
SAN RAMON, CA 94583-0000

BARCLAYS/OLD NAVY
PO BOX 8803
WILMINGTON, DE 19899-0000

BMO HARRIS BANK
BANKRUPTCY DEPT. BRK-1880-RC
770 N. WATER STREET
MILWAUKEE, WI 53202-0000

BRAVERA BANK
320 N. 4TH ST.
BISMARCK, ND 58501

BUCHALTER
MARK M. SCOTT, ESQ.
18400 VON KARMAN AVE. SUITE 800
IRVINE, CA 92612

CAPITAL ONE
11013 W BROAD ST
GLEN ALLEN, VA 23060

CAPITAL ONE BANK (USA) N.A.
4851 COX ROAD
GLEN ALLEN, VA 23060

CBB COLLECTIONS
200 N. 34TH ST.
BILLINGS, MT 59101

CHOICE FINANCIAL GROUP
ATTN: LISA ARTZ, REGISTERED AGENT
4501 23RD AVENUE S.
FARGO, ND 58104-8782

CREDIT ONE BANK
PO BOX 98875
LAS VEGAS, NV 89193-8875

CROWLEY FLECK PLLP
100 W. BROADWAY SUITE 250
PO BOX 2798
BISMARCK, ND 58502

DISCOVER FINANCIAL SERVICES, LLC
PO BOX 3025
NEW ALBANY, OH 43054-3025

DRAIN SERVICES, INC. DIP
MAURICE VERSTANDIG
1630 1ST AVE. N. SUITE B PMB 24
FARGO, ND 58102

ENTERPRISE RENT-A CAR
600 CORPORATE PARK DR
SAINT LOUIS, MO 63105

FIRST COMMUNITY CREDIT UNION
111 9TH STREET SW
PO BOX 2075
JAMESTOWN, ND 58402-0000

INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATION
P O BOX 7346
PHILADELPHIA, PA 19101-7346

LOANCARE, LLC
3637 SENTARA WAY
VIRGINIA BEACH, VA 23452

LVNV FUNDING, INC.
PO BOX 10497
GREENVILLE, SC 29603

LVNV FUNDING, LLC
RESURGENT CAPITAL SERVICES
PO BOX 10587
GREENVILLE, SC 29603-0587

MIDLAND CREDIT MANAGEMENT
8875 AERO DRIVE
SAN DIEGO, CA 92123-0000

MOHELA/DEPT. OF ED
CLAIMS DEPARTMENT
633 SPIRIT DRIVE
CHESTERFIELD, MO 63005

MORGAN R. GLINES
RE: HOROB V. DRAIN SERVICES
2151 36TH AVE. SW SUITE B
MINOT, ND 58701

NORTH DAKOTA OFFICE OF STATE TAX
COMMISSIONER
600 EAST BOULEVARD AVENUE
DEPARTMENT 127
BISMARCK, ND 58505-0552

ORION FIRST FINANCIAL, LLC
5201 OLYMPIC DRIVE NW SUITE 210
GIG HARBOR, WA 98335

PAYPAL CREDIT SERVICES/SYNCB
PO BOX 960080
ORLANDO, FL 32895-0080

QUANTUM3 GROUP LLC AS AGENT FOR
CREDIT CORP SOLUTIONS INC.
PO BOX 788
KIRKLAND, WA 98083-0788

RADIO FARGO MOORHEAD
2720 7TH AVENUE SOUTH
FARGO, ND 58103-0000

USPS FIRST CLASS MAIL RECIPIENTS OF THIS NOTICE OF SERVICE: Recipients of this via First Class USPS Mail Service.
Parties with names struck through or labeled CM/ECF SERVICE were not served via First Class USPS Mail Service.

SELF/SOUTH STATE BANK
901 E 6TH ST. SUITE 400
AUSTIN, TX 78702-3206

TONY HAMILTON
116 48TH AVE. E.
WEST FARGO, ND 58078

U.S. SMALL BUSINESS ADMINISTRATION
JOHN W. BAKER, ATTORNEY
721 19TH ST. SUITE 426
DENVER, CO 80202

UNITED STATES ATTORNEY
655 1ST AVE N STE 250
FARGO, ND 58102-4932

US BANK
BANKRUPTCY DEPARTMENT
PO BOX 5227
CINCINNATI, OH 45201-5229

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

**In re:**

**Drain Services, Inc.**                                    **Bankr. No. 23-30352**

     **Debtor**                                          **Chapter 11**

---

### UNSWORN CERTIFICATE OF SERVICE

---

The undersigned declares under penalty of perjury that on December 7, 2023, I caused to filed

electronically the following:  Objection, thereby generating service by CM/ECF.

  Executed on:      December 7, 2023

                                             **/s/ Sarah J. Wencil**
                                             **Sarah J. Wencil**
                                             **Office of the United States Trustee**