IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: ) | Case No. 23-30352 |
| ) | (Chapter 11) |
| DRAIN SERVICES INC. ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |

**OMNIBUS RESPONSE TO OBJECTIONS**
**TO CONFIRMATION OF PLAN OF REORGANIZATION**

Comes now Drain Services Inc. ("Drain Services" or the "Debtor"), by and through undersigned counsel, and in response to (i) the Acting US Trustee Objections to Drain Services, Inc. Subchapter V Plan (the "UST Objection," as found at DE #82) filed by the United States Trustee (the "US Trustee"); (ii) the Objection of Tony Hamilton to Debtor's Subchapter V Plan of Reorganization (the "Hamilton Objection," as found at DE #84) filed by Tony Hamilton ("Mr. Hamilton"); (iii) the Objection to Confirmation of Debtor's Subchapter V Plan of Reorganization (the "United States Objection," as found at DE #85) filed by the United States of America; and (iv) Choice Financial Group's Objection to Confirmation of Drain Services, Inc.'s Subchapter V Plan of Reorganization (the "Choice Objection," as found at DE #86) filed by Choice Financial Group ("Choice") states as follows:

**I.     Introduction**

Drain Services filed a plan of reorganization (the "Plan," as found at DE #69) carefully designed to permit a debtor with volatile cash flows to satisfy the rigors of Title 11 of the United States Code (the "Bankruptcy Code"); the Plan was not as clearly designed to win any popularity contests. The barrage of objections thereto raise myriad issues, many of which are perfectly meritorious in nature. Some of the objections, while no doubt well intentioned, appear to be less meritorious.

1

Accordingly, attached hereto as Exhibit A is a proposed form of an amended plan of reorganization (the "Amended Plan"). A redline draft is attached as Exhibit B, for ease of reference. This is designed to address each objection the Debtor finds availing, inclusive of the most economically-impactful of such objections. Non-exhaustively, the Amended Plan (i) creates a mechanism for the payment of general unsecured creditors by debiting the Debtor's operating reserves whenever they cross a fixed threshold; (ii) pays gap interest to the Internal Revenue Service; (iii) removes the Subchapter V trustee as a disbursing agent and has the Debtor make payments directly, so as to permit more frequent payments to creditors while minimizing administrative expenses; (iv) inserts language suggested by the US Trustee; and (v) refreshes the list of creditors, and size of classes, to reflect the evolution of the claims register from the time of filing of the original Plan.

The Amended Plan should quell the majority of objections lodged against the initial iteration. Some points of contention do, however, remain. And they are accordingly addressed herein.

## II.     Objection of the United States

The United States Objection is perhaps the easiest to address. The government notes that (i) interest needs to be paid to the Internal Revenue Service (the "IRS") for the period between the petition date and the effective date of the Plan; (ii) payments should be monthly, not quarterly; (iii) the IRS needs to be paid in full; and (iv) the IRS wishes to be paid by paper check. *See* United States Objection, DE #85, *passim*.

The Debtor does not take issue with any of these contentions and believes they have been uniformly addressed in the Amended Plan. To the extent the United States maintains any of the foregoing issues to not be properly addressed in the Amended Plan, the Debtor is more than open

2

to consenting to alternative language that may be imposed through an addendum or in the body of a confirmation order.

### III.  Objection of the US Trustee

The UST Objection is appreciably lengthier than that of the United States and, as such, invites a more nuanced response. The heart of the document contends that the Plan is unconfirmable, discriminates unfairly, and runs afoul of governing law, by allowing the Debtor to accrue operating reserves while not paying general unsecured creditors. The objection goes on to make various procedural observations before suggesting the insertion of certain language. The core objection is addressed by the Amended Plan, as are some of the other objections; the Debtor does, however, maintain a few objections to be superfluous.

With regard to the core objection, the Bankruptcy Code specifically contemplates that small business debtors will need an operating reserve during the course of a plan of reorganization. 11 U.S.C. § 1191(d). Drain Services acknowledges the reserves projected are overly-generous, but equally notes (as has been well evidenced during the pendency of this case) that its business model can invite oft-dramatic cash flow fluctuations. To balance these realities, the Amended Plan provides for the Debtor to be permitted to accumulate $100,000.00 in operating reserves before being compelled to pay excess monies over to creditors (first to secured creditors and then to general unsecured creditors). This creates a mechanism where secured claims can be earlier retired and general unsecured claimants (excepting insiders) can receive the benefit of plan payments in the later months of the five year period. The Amended Plan also makes clear that any insurance recovery will be paid over to Choice which, in turn, will invite the earlier retirement of Choice's claim and the availability of monies to be paid over to general unsecured creditors.

3

Vis a vis the US Trustee's first procedural observation (paragraph 16 of the UST Objection), the proposed introductory language appears to be mooted by the foregoing portions of the Amended Plan. The contemplated verbiage is also outside the purview of Official Form 425A, which generally (albeit somewhat liberally) governs the format of Subchapter V plans. As for the ensuing concerns about the liquidation analysis (paragraph 17 of the UST Objection), the Debtor appreciates that the projection of legal fees is speculative but, equally, notes that much of a liquidation analysis is *per se* speculative for any debtor whose assets are not comprised of cash on hand and highly liquid securities. The analysis is a good faith projection of how matters might proceed in a Chapter 7 context, juxtaposed to the treatment proposed in Chapter 11. And given that the two numbers are not particularly close (especially with the Amended Plan's added distributions), it is respectfully submitted these concerns ought not stand in the way of confirmation.

The US Trustee next suggests the Plan value the insurance claim in Article 3. UST Objection, DE #82, at ¶ 18. The Debtor has no conceptual problem with this suggestion but, equally, is genuinely unsure of the value of the claim. While the Debtor knows the acquisition cost of the subject stolen property, the Debtor does not feign to have a precise replacement value, much less to know what value might be ultimately assigned by an insurance adjuster. And there is thusly a concern that attaching a value to the claim, in the context of the Plan, could be misleading or unduly speculative.

Paragraphs 19 and 20 of the UST Objection are well taken, with proposed language being incorporated in the Amended Plan. Paragraph 21 (concerning the disbursing agent) is mooted by the Amended Plan disposing of the disbursing agent.

As for the next objection, *Id.* at ¶ 22, the Debtor believes it proper to place secured claims in the same class, even though the claims correlate to different creditors. Specifically, the Bankruptcy Code provides, *inter alia*, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Here, the two claims in Class 2 are substantially similar to one another inasmuch as both are (i) wholly secured; (ii) secured against the Debtor's assets; and (iii) being treated identically under the Plan. The classification is thusly in accord with that permitted by Section 1122 of the Bankruptcy Code and should stand in its current form.

The UST next asks the Debtor to specifically identify leases to be assumed since a cross-reference to schedules requires parties to have access to schedules. UST Objection, DE #82, at ¶ 23. While it is appreciated that not all parties have access to CM/ECF, the docket in this case is freely available online. *See* https://www.courtlistener.com/docket/67847748/drain-services-inc/ (last accessed Dec. 10, 2023). Moreover, the sole scheduled lease is for the Debtor's building, with the Plan otherwise delineating all categories of leases/contracts to be assumed. *See* Amended Plan at § 6.01 ("The Debtor also assumes all executory contracts and unexpired leases for (i) the provision of utility services to any building occupied by the Debtor; (ii) the provision of utility services to the Debtor; (iii) the provision of merchant loyalty rewards, whether in the form of points, coupons, or otherwise, to the Debtor; (iv) the provision of insurance to the Debtor; and/or (v) the purchase of goods and/or services from the Debtor. To the extent the claim of the SBA may be construed as an executory contract, for purposes of preserving the interest rate set forth in the correlative promissory note, the Debtor assumes the same.").

The next several objections concern the disbursing agent, who is replaced in the Amended Plan. These should accordingly be moot. The UST Objection also touches on the question of who

5

is paying which claims. *See* UST Objection, DE #82, at ¶ 26. This issue should also be resolved by the elimination of the disbursing agent. And a concern about the escheat clause, *Id.* at ¶ 28, is, too, addressed by amendment.

The final point of objection concerns the discharge language of the Plan. *Id.* at ¶ 28.[1] In a recent Subchapter V case, this Honorable Court was confronted with a different form of objection to discharge language, ultimately resolving that "Discharge shall be in accord with the Bankruptcy Code" was proper verbiage. *See In re Glenn,* Case No. 23-30132 (Bankr. D. N.D. 2023) at DE #96, DE #97. The same language has been used here in the interests of consistency and in hopes of continuing to develop a Subchapter V plan outline that generally conforms to this Honorable Court's rigors. So while the Debtor is not *per se* troubled by the UST's objection on this front, it is nonetheless submitted that there is no reason to deviate from the language arrived upon at the last contested Subchapter V confirmation hearing.

## IV.    Objection of Mr. Hamilton

The Hamilton Objection overlaps, largely, with that of the UST, and thusly does not appear to be meritorious of added discussion *sub judice*.

## V.    Objection of Choice

The Choice Objection is the final item meriting attention herein, with there being no secret that the Debtor and Choice have enjoyed an oft-contentious historic relationship, punctuated by the financial institution's efforts to freeze Drain Services' assets in state court that, in turn, beget this bankruptcy case. This is the creditor with the least to lose should the Debtor fail, as Choice holds an over-secured first position lien on nearly all of Drain Services' assets. But this is also a

---

[1] There are two paragraphs bearing the number "28." This is a reference to the latter such paragraph.

6

creditor that has repeatedly expressed interest in ensuring Drain Services reorganize for the benefit of all parties in interest. And it is, as such, an objection that very much ought to be taken seriously.

Unfortunately, the first argument of Choice – that Drain Services has exceeded its permitted utilization of cash collateral – is manifestly errant. While there is no question but that the Debtor ran afoul of an interim cash collateral order in the early days of this case, the Debtor has been in compliance with the final cash collateral order at all times since. The Debtor had "approximately $107,520.76 in cash on hand" on October 17, 2023. *See* DE #51 at ¶ 6. This Honorable Court permitted the Debtor to "use not more than $113,000 in cash collateral between October 17, 2023, and December 31, 2023." Order Granting Debtor's Motion for Leave to Use Cash Collateral, DE #64, at ¶ 2. In and of itself, this language would make it exceedingly difficult for the Debtor to violate the final cash collateral order. But this is even more so when one considers that the $35,000.00 in funds paid to Choice as and for adequate protection do not count against the subject limit.

Again, the Debtor ran afoul of the first interim cash collateral order. There is no elegant means of denying this rather plain point, nor is there any utility in trying to spin this reality. The Debtor acknowledged this error in open court shortly thereafter, the Debtor was (quite appropriately) admonished for running afoul of the initial cash collateral order, and the Debtor resolved to not do so again. The Debtor has abided by this commitment at all times since (no doubt aided by guardrails that would make a violation almost impossible from a mathematical perspective). And it is thusly difficult to square the allegations of Choice with the plain language of the final cash collateral order.

The second argument of Choice concerns the Debtor's failure to apply all projected disposable income to plan payments. As noted *passim*, this is addressed through the Amended

7

Plan, which creates a mechanism for the distribution of excess monies to creditors. As an extension of this argument, Choice also indicates that the reamortization of obligations in the Plan is problematic. *See* Choice Objection, DE #86, p. 4. The Debtor takes issue with this objection, as permitting an obligor to reamortize payments would not seem to run afoul of the Bankruptcy Code (which pegs the payment obligations to "projected" disposable income – not "all" disposable income, 11 U.S.C. § 1191(c)(2)(A)). But, in any event, the reamortization language has been stripped from the Amended Plan, as a show of the Debtor's sincere interest in finding common ground with Choice and endeavoring to create a consensual groundwork for confirmation.

The next contention of Choice is that the Debtor's schedules are inaccurate because assets are scheduled at acquisition cost and not fair market value. *See* Choice Objection, DE #86, p. 4. However, as noted by the UST in its own objection, "[t]he Plan's liquidation analysis notwithstanding, the UST would agree that the Debtor has consistently testified that the equipment value ($881,7121 of total value of $1.6 million) is valued at acquisition value." UST Objection, DE #82, at ¶ 17.

The Debtor's assets are largely illiquid in nature. As adduced in testimony at first day hearings, it is genuinely not clear if there would be much of a market – if any market – for some of the more niche items. And it would be accordingly difficult for the Debtor to ascertain the fair market value of these assets in their current condition. Drain Services has, accordingly, elected to always list the acquisition cost of each item and, at the same time, to be wholly open about so doing, in the interests of avoiding ambiguity and deception. It was believed this is (and has been) more beneficial than simply writing "unknown" on each correlative line of Schedule A/B. And, notwithstanding the objection of Choice, the Debtor maintains this was the correct course of action – providing as much information as possible, clearly labeling the limits of that information, and

then answering topical questions under oath in open court and at a meeting pursuant to Section 341 of the Bankruptcy Code.

Choice subsequently takes issue with the Debtor's inclusion of language permitting non-material modifications to the Plan without notice and a hearing. While this is a standard provision, Choice does appear to be correct that Section 1193 of the Bankruptcy Code is more limiting in this regard than are the provisions governing traditional Chapter 11 plans. It seems unfortunate that a modification to correct a typo would invite the expense of noticing an entire matrix but, alas, such may well be a qualm best directed toward Congress; the Debtor does not oppose this provision being altered in the confirmation order.

Next, Choice argues that the Plan is unclear about the modification of loan documents, with Choice later arguing – similarly – that "[t]he Plan does not provide a clear statement what Choice Bank will retain in the way of liens in the Debtor's cash collateral." Choice Objection, DE #86, pp. 6, 9. To be sure, both the Plan and the Amended Plan do provide, *inter alia*, "Choice will retain its validly perfected lien on all of the Debtor's assets, until such a time as the debt to Choice is paid in full." Plan, DE #69, at Article 4, Class 2. But such may also be well besides the point, inasmuch as the monies made by the Debtor, post-petition, are not the cash collateral of Choice or anyone else, except to the extent encumbered by a replacement lien under the cash collateral order. *See* 11 U.S.C. § 552. Nonetheless, if Choice wishes to have the confirmation order clearly recite

9

that Choice and the United States will both continue to have replacement liens to the extent of the diminution of their pre-petition cash collateral, the Debtor has no objection to such.[2]

Choice also attacks the Plan's feasibility, arguing a lack of future funding may compromise the Debtor's operations. There is some irony to this position, as it is Choice that has received $35,000.00 in adequate protection payments, during the pendency of this case, leaving the Debtor in its current position. But, this oddity notwithstanding, testimony as to feasibility will be adduced at the confirmation hearing and the Debtor is confident such will carry the appropriate burden.

Finally, Choice indicates that its claim is not being paid in full, "[p]ost-petition interest also does not appear to be included," and "[t]he Plan does not provide that Choice Bank retains its liens on all collateral." On the first point, there was a slight difference between the sum Choice indicated it was owed at first day hearings and the amount on Choice's claim (filed after the Plan); the Debtor has updated its Amended Plan to reflect the sum on Choice's proof of claim. On the second point, and as is clear from the amortization schedule appended to the Plan and the Amended Plan, Choice *is* being paid interest on its claim. And as to the third point, the Plan and Amended Plan are quite clear: "Choice will retain its validly perfected lien on all of the Debtor's assets, until such a time as the debt to Choice is paid in full." Plan, DE #69, at Article 4, Class 2.

---

[2] To the extent Choice is suggesting the Plan should set forth new loan documents, with new covenants, such appears to be fundamentally at odds with the spirit of a Subchapter V bankruptcy. It is the Plan (or, as is likely, Amended Plan) that will control the relationship of the parties going forward; a default provision is included in the document and myriad obligations are established thereunder. But, for the avoidance of ambiguity, the Debtor is not offering to sign a new promissory note, endorse a new security agreement, or enter into a new loan agreement; such is not typical of a Subchapter V plan and the Debtor respectfully submits that compliance with the rigors of the Plan (or Amended Plan) is sufficient.

VI. **Conclusion**

WHEREFORE, Drain Services respectfully prays this Honorable Court (i) permit the Debtor to docket the Amended Plan; (ii) overrule the various objections to confirmation; and (iii) confirm the Amended Plan.

Respectfully submitted,

Dated: December 10, 2023  By:  /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of December, 2023, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig