IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-30352 |
| | ) | (Chapter 11) |
| DRAIN SERVICES INC. | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## DRAIN SERVICES, INC.'S AMENDED
## SUBCHAPTER V PLAN OF REORGANIZATION

Comes now Drain Services, Inc. ("Drain Services" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following amended plan of reorganization (the "Plan") herein:

### Background for Cases Filed Under Subchapter V

**a. Description and History of the Debtor's Business, History of this Case, and Overview of this Plan**

**i.     History and Overview**

Take a short walk through Fargo – or any number of surrounding communities in the region – and one will encounter the work of Drain Services almost as assuredly as one will not notice the work of Drain Services. A part of the North Dakota business community since October 3, 2011, the Debtor is a preeminent commercial, municipal, and residential sewer replacement company. Drain Services honors every bit of its eponymous claim, performing drain inspections, repairing sewer lines, using cutting edge trenchless techniques, addressing lateral connection seals, and even offering televised video inspections of pipelines.

Owned by Caitlyn Cameron and chiefly operated by her husband, Kevin Cameron, the Debtor has a sturdy reputation amongst its versatile client base, boasting of more than a decade in service to the greater North Dakota community while also having undertaken niche jobs as far away as Alaska. Through that history, the entity has always shown impressive revenue streams and, with those funds, an ability to aid the local job market in accord with seasonal fluctuations in business.

In late 2021 and early 2022, Drain Services took a series of short term loans from Choice Financial Group ("Choice"), totaling approximately $240,000.00 in principal. The funds were largely devoted to helping the Debtor acquire the equipment necessary to undertake a particularly ambitious government contracting job in Wisconsin. Complications with the work soon ensued, however, and Drain Services was left with a $600,000.00 receivable largely relegated to the ominous "doubtful" column. It thusly followed that when the loans came due, the Debtor was not in a position to retire them at maturity.

To be sure, Drain Services always had the ability to continue making interest payments on the notes held by Choice, and continued to tender such monies well after each loan's maturity date. But protracted workout discussions eventually turned sour, with the Debtor feeling as though

Choice had dishonored certain informal commitments concerning how the debt might be addressed on a forward-looking basis. When Drain Services' equity holder declined to pledge assets of a separate-but-related entity in exchange for an extension of the then-extant due dates of the debt, litigation ensued.

### ii.    Bankruptcy Operations

The Debtor petitioned for bankruptcy relief at 1:25 pm on Monday, October 2, 2023. That timestamp was neither coincidence nor folly; Choice stood ready to seek an injunction, essentially freezing Drain Services' assets, in state court, just minutes later.[1] And so this case was commenced, with the Debtor looking to expediently reorganize its various debts in a manner cognizant of cash flows and equitable to the interests of all creditors – including the triumvirate of secured creditors holding liens that overlap, partially or fully, with that of Choice.

Since commencing this case, the Debtor has continued ordinary operations, servicing the needs of the communities in which the entity operates, making regular payroll, and paying its post-petition obligations as they come due. The case has, no doubt, experienced certain anomalous constructs, including Drain Services departing the contours of the first interim cash collateral order and then, shortly thereafter, acquiring an expensive piece of machinery through a transaction that flirts intimately with the contours of the "ordinary course" limitations set forth in Title 11 of the United States Code (the "Bankruptcy Code"). But so, too, has the Debtor demonstrated an eagerness to share financial intricacies with major stakeholders, permit maximum visibility into Drain Services' operational nuances, and engage meaningful dialogue with counsel for parties in interest.

### iii.    Plan Overview

Whether or not this Plan ultimately proves consensual remains to be seen. Drain Services is burdened by secured debt obligations that exceed $850,000.00, with the Bankruptcy Code requiring interest payments be made on those obligations over the life of this Plan. 11 U.S.C. § 1129(b)(2)(A)(i)(II). While the various debts carry different non-default and default interest rates (at least one of which is pegged to the floating Wall Street Journal prime rate), governing law dictates that such claims need only be paid based on their "value, as of the effective date," 11 U.S.C. § 1129(b)(2)(A)(i)(II), and that "the current market rate for comparable loans be utilized in determining interests to assure present value." *In re Bollingberg*, 1986 WL 713527, at *6 (Bankr. D.N.D. 1986) (citing *Matter of Southern States Motor Inns, Inc.*, 709 F.2d 647, 652–53 (11th Cir. 1983); *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir. 1985); *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir. 1982)).

The Eighth Circuit has recently affirmed confirmation of a plan that applies the 20 year treasury rate, with a 2% risk adjustment, as a case-specific computation of "value, as of the effective date." *In re Topp*, 75 F.4th 959 (8th Cir. 2023). The 20 year treasury rate, as of the

---

[1] The Debtor's counsel did contact Choice's counsel, the morning of October 2, 2023, to offer an informal heads-up the bankruptcy petition was coming. A follow up call was placed as soon as the petition was docketed. There was never a desire to compel counsel to travel to court for an ill-fated hearing, but also a full appreciation that the tight timeline would create some unwanted temporal drama.

drafting of this Plan, is 4.9%. U.S. Treasury Quotes, *Wall Street Journal*, Nov. 4, 2023, https://www.wsj.com/market-data/bonds/treasuries. Since this Plan calls for secured claims to be paid within five years (excepting one 30 year note that is to be paid pursuant to its express terms), the Debtor would urge the risk adjustment ought to be nominal, especially in light of the extensive collateral underpinning these secured claims. But, equally, one of the secured claims belongs to the Internal Revenue Service (the "IRS") and, as such, must be paid at a "rate determined under applicable nonbankruptcy law." 11 U.S.C. § 511. That rate is "the Federal short-term rate … plus … 3 percentage points." 26 U.S.C. § 6621. As of the anticipated effective date of this Plan, the resulting rate is 8%. Rev. Rul. 2023-49 (IRS RRU 2023).

The Debtor is keen to (i) avoid a dispute as to feasibility; (ii) pay all defaulted secured obligations at the same 8% interest rate; (iii) project financials that allow for conservative operation of Drain Services in a manner optimally designed to avoid a return to this Honorable Court; and (iv) provide for the payment of general unsecured claims to the extent economically feasible. As such, the Debtor has made the decision to honor its obligations to commit Drain Services' "projected disposable income," 11 U.S.C. § 1191(c)(2), to the payment of secured claims over a seven year period, while also paying more than $139,000.00 toward the claims of general unsecured creditors over a seven year time horizon.

Accordingly, this Plan may be most simply summarized as follows: the Debtor will (a) pay its non-defaulted obligation, on a 30 year note held by the United States Small Business Administration (the "SBA"), in accord with the terms of that note; (ii) pay the nominal priority claim of the IRS (being $52.44) on the effective date (as defined in Section 8.02 *infra*); (iii) pay all other secured claims over a period of seven years,[2] in irregular intervals designed to allow for the payment of administrative expenses; (iv) pay allowed administrative expense claims over three months;[3] (v) pay $78,099.21 toward the claims of general unsecured creditors during the five year life of this Plan; (vi) pay certain excess monies, if any, toward the claims of general unsecured creditors, during the five year life of this Plan; and (vii) create a trust, for the benefit of general unsecured creditors, to be given a promissory note for $60,999.12, payable and amortized over two years, without interest, at the conclusion of the life of this Plan.

**b.  Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. The Debtor has scheduled its hard assets at only their acquisition cost, while listing cash at par value and receivables at a discounted sum that

---

[2] Inasmuch as the Debtor is not permitted to have a plan of reorganization that spans more than five years, 11 U.S.C. § 1191(c)(2)(A), Drain Services will give the subject secured creditors promissory notes, secured by their existing liens, at the end of the fifth year, so as to facilitate the making of an additional two years of payments.

[3] Counsel for the Debtor anticipates having an administrative expense claim in excess of the retainer being held as security for that claim. Counsel will agree to have that claim, if allowed, paid through partial application of the first three plan payments. It is not known if the Subchapter V trustee (the only other logical holder of an administrative expense claim) will consent to similar treatment.

accounts for doubtful accounts. DE #51. Given the illiquid and extraordinarily niche nature of much of the Debtor's equipment, it is possible the Debtor's estate would fetch far less than the $1,682,105.02 indicated on Drain Services' amended schedules, with the Debtor's best guess being that approximately two thirds (2/3) of equipment value – or $581,929.92 – would be lost in the liquidation process, resulting in the Debtor's estate having a total liquidation value of $1,100,175.10.

The Debtor additionally notes that a Chapter 7 liquidation would be burdened by (i) a trustee's commission of approximately $56,250.00; (ii) legal fees for the representation of a trustee of approximately $20,000.00; (iii) legal fees incurred in connection with a contested motion to convert this proceeding to one under Chapter 7, being approximately $5,000.00; (iv) auctioneers' commissions and/or brokers' commissions of approximately $100,000.00; and (v) a loss of work in process on account of the Debtor's cessation of operations as a going concern, being at least $100,000.00. So while Drain Services maintains that its assets do exceed its liabilities so long as the entity continues in operations, the Debtor asserts that a Chapter 7 liquidation would ultimately deliver only $818,925.10 to creditors – a sum less than the $925,515.20 in scheduled secured claims and, as such, a sum that would leave the estate administratively insolvent, returning nothing to general unsecured creditors and diminishing the extent of a return to secured creditors (with the SBA bearing the brunt of the discount).

### c. Ability to Make Future Plan Payments and Operate Without Further Reorganization

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Forward-looking financial projections for the Debtor are being filed herewith. These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code), remaining after the payment of administrative expenses addressed below, for the period in § 1191(c)(2).

While not reflected in the projections, it bears notation that the Debtor has substantial hard assets – including four motor vehicles – that can be sold off to raise funds for payments, should there be an operational cash flow shortfall. The Debtor does *not* believe it prudent to take such actions, unless absolutely needed, inasmuch as a reduction in Drain Services' vehicle fleet would negatively impact the entity's growth prospects. Such an asset sale may also negatively impact the Debtor's ability to secure certain otherwise-profitable work on a forward-looking basis. But inasmuch as the projections are innately pegged to a prognostication of entities in need of drain/sewer work several years henceforth, and inasmuch as such predictions – while empirical and while rooted in historic data – have a necessary element of voodoo, Drain Services would be remiss to not observe that a secondary means of partial Plan funding does exist.

Equally, it bears notation that the projections do *not* include funds from an insurance claim made by Drain Services, on account of stolen property. The Debtor has an extraordinary level of confidence that this claim will be paid in full, and that the funds can accordingly be used to make expedited Plan payments to creditors. The insurance claim, if paid in full (and such is not a certainty that ought to be relied upon by any party in interest), would potentially invite a recovery in excess of $100,000.00. But in the interests of caution and conservatism, the Debtor has not budgeted for receipt of these monies.

4

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.        Summary**

This Plan proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:        2 classes of secured claims;

2 classes of non-priority, unsecured claims; and

1 class of an equity holder.

Non-priority unsecured creditors holding allowed claims will not receive distributions. The Plan does, however, provide for the payment of administrative claims and tax claims.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.        Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of the SBA |
| **Section 2.02** | **Class 2** | The secured claims of Choice and Bank of the West. |
| **Section 2.03** | **Class 3** | All general unsecured claims, including the unsecured, non-priority portion of the claim of the IRS, but excluding the unsecured claim of DSI Investments, LLC. |
| **Section 2.04** | **Class 4** | The unsecured insider claim of DSI Investments, LLC. |
| **Section 2.05** | **Class 5** | Equity interests in the Debtor. |
| **Section 2.06** | **Class Identification** | A schedule of each class and its constituent creditors is appended hereto as **Exhibit A.** The total size of the non-disputed claims (or, where applicable, the non-disputed portion of claims)[4] in each class is as follows: |

Class 1: $527,810.02

Class 2: $302,722.16

Class 3: $163,869.98

---

[4] The Debtor's classification, in Exhibit A, of a sum as being "Undisputed" is without prejudice to the Debtor's right to later challenge a correlative claim. Specifically, and without limitation, the Debtor lists the obligation putatively due to Choice as being "undisputed," but the Debtor may later challenge one or more components of that alleged debt.

Class 4: $24,000.00

Class 5: N/A (equity)

The total undisputed secured claims total $830,532.18, not counting the unclassified secured claim of the IRS in the amount of $53,333.25. The total undisputed unsecured claims total $187,869.98, excluding the priority claim of the IRS in the amount of $52.44 and the priority claim of Tax Professionals P.C. in the amount of $805.50, but including the general unsecured claim of the IRS in the amount of $1,036.03 and the general unsecured claim of Tax Professionals P.C. in the amount of $2,310.00.

| | | |
|---|---|---|
| **Article 3.** | **Treatment of Administrative Expense Claims and Court Costs** | |
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the effective date. Any such claims paid by the Debtor prior to its first scheduled ordinary payment under this Plan shall be a credit against said payment, except to the extent paid from a retainer held by counsel for the Debtor. The foregoing notwithstanding, if the Debtor lacks the cash on hand to pay such a claim within five (5) days of said claim being allowed pursuant to a final order, and if the creditor to whom such claim is owed agrees, the Debtor may pay such claim through the ordinary payments provided for under this Plan. The Debtor's counsel has consented to such treatment of any administrative expense claim allowed by this Honorable Court. This Plan budgets for the sum of $7,488.00 to be applied to administrative claims in February, March and April of 2024, for a total of $22,464.00. The Debtor's counsel is holding a retainer of $6,762.00 that, with the foregoing payments, will make a total of up to $29,226.00 available for the |

payment of administrative expense claims. Any excess monies will inure to the benefit of the Debtor but may, in the Debtor's discretion, be applied to the making of early payments to the Internal Revenue Service. Post-petition, the Subchapter V Trustee shall continue to apply for all fees in accordance with Sections 330 and 331.

The Subchapter V Trustee has filed an interim application for administrative expenses in the sum of $5,105.58 that, in turn, has been granted. DE #76, DE #98. It is not known what fees and/or expenses have been incurred by the Subchapter V Trustee since this interim application was filed.

Counsel for the Debtor has not yet filed a fee application but reasonably estimates his total time and expenses, as of December 22, 2023, to be less than $17,500.00. Counsel for the Debtor will need to file an application for compensation before being paid and the allowance, *vel non*, of that application will a matter of this Honorable Court's discretion. Counsel for the Debtor will incur additional fees preparing for a confirmation hearing and attending the subject hearing. Counsel for the Debtor does not charge for his travel expenses or travel time in connection with cases in the United States Bankruptcy Court for the District of North Dakota, except where travel is required to a location other than Fargo, North Dakota; no such travel outside of Fargo has been necessitated by this case and it does not appear any such travel will be necessitated.

| | | |
|---|---|---|
| **Section 3.03** | **Priority Tax Claims** | The Debtor owes $52.44 in priority tax claims. This sum will be paid on the effective date, independent of other payments made under this Plan. |
| **Section 3.04** | **Secured Tax Claims** | The Debtor owes $53,333.25 in secured tax claims, which does not include the priority claim of the IRS treated in Section 3.03 *supra*. This obligation will be paid at the statutory interest rate of 8%, with payments commencing May 1, 2024 and being in the amount of $1,236.55, per month, through September 2028. A final payment of $1,245.67 will be made on or before in October 1, 2028. An amortization schedule showing the application of |

Plan payments to the secured claim of the IRS is attached hereto as **Exhibit B**.

Payments to the IRS shall be deemed made on the date of receipt by the IRS.

This claim is being regarded as the equivalent of a tax priority claim and, as such, paid in full within five years of the petition date (October 2, 2023).

The Debtor shall direct payments to the Internal Revenue Service to the following address:

> Internal Revenue Service
> 575 N. Pennsylvania St.
> Stop SB380
> Indianapolis, Indiana 46204

Payments to the IRS shall be made by check or money order made payable to the United States Treasury and should be identified with the debtor's bankruptcy case number and the debtor's Employer Identification Number (EIN).

In the event the Debtor defaults in the terms of this Plan, the statutory rate of interest, as computed by the Internal Revenue Code, shall be deemed applicable in determining the unpaid balance.

The Debtor shall remain current with all its post confirmation federal tax obligations, including making deposits and payments and filing returns, during the period the payments required under the Plan are being made. A failure to make post-confirmation tax deposits, payments, and filings in a timely fashion, as required by Title 26 of the United States Code, shall be deemed a default under the terms of the Plan and subject to the provisions of Section 8.05 of this Plan.

Upon default, and in addition to the remedies expressly set forth in Section 8.05 of this Plan, the IRS shall have the right to file notices of federal tax liens and take whatever other administrative or judicial collection action it deems appropriate pursuant to Title 26 of the

8

United States Code and any other provisions of the law, without further approval of this Honorable Court.

| | | |
|---|---|---|
| **Section 3.05** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.06** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |
| **Section 3.07** | **Priority Claim of Tax Professionals P.C.** | The Debtor will pay the priority claim of Tax Professionals P.C. within 30 days of the effective date. This claim is in a *de minimis* sum and is not otherwise budgeted for herein. The Debtor will pay this claim out of its cash on hand. |

**Article 4.    Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – SBA | Impaired[5] | Class 1 consists of the secured claim of the SBA. Pursuant to the terms of the promissory note, the Debtor is to make monthly payments of $2,562.00 every month, from February 2024 through January 2052, with any unpaid principal and interest coming due on February 11, 2052. |
| | | The Debtor will pay this claim pursuant to the express terms of the underlying promissory note, with the SBA retaining its validly perfected security interest in all of the Debtor's assets. Inasmuch as this claim is being paid beyond the five year horizon of this Plan, the Debtor understands that a |

---

[5] While the Debtor has not missed any payments on this obligation, and while the obligation will still be paid pursuant to the terms of the underlying promissory note, the Debtor believes a default to have occurred because Choice "exercise[d] its rights against the Collateral," in contravention of Section 9 of the Security Agreement. Claims Register #1 at p. 9. Though Choice did not succeed in freezing the collateral prior to this case being filed, the conditioning of cash collateral usage, upon the making of payments to Choice, was no doubt an exercise of Choice's rights against said collateral. By virtue of this default, the SBA had the right (but not the obligation) to accelerate the Debtor's payment obligations. *Id.* As such, the Debtor is classifying the SBA as an impaired creditor herein.

discharge will not be granted as to the debt owed the SBA. 11 U.S.C. § 1192.

The foregoing notwithstanding, should there come a time when the United States or any agency thereof offers to forgive obligations owing on secured disaster loans of the type underlying the Class 1 claim, or to otherwise furnish partial forgiveness or relief in connection with the obligations attendant to such loans, the Debtor may avail itself of such forgiveness, aid and/or relief, and this Plan shall not be deemed to create any independent obligation of the Debtor over and above that provided for in the subject loan documents.

| | | |
|---|---|---|
| Class 2 – Choice and Bank of the West | Impaired | This class consists of the secured claims of Choice and Bank of the West. |

Based on information provided to Debtor by Choice, after adequate protection payments, and accrual of post-petition interest and attorney's fees incurred by Choice, the total of Choice's claim as of February 13, 2024, will be $286,983.54. The Debtor reserves its right to object to this claim and/or to seek a more detailed accounting. The allowed claim of Choice will be paid at 8% interest, over a period of seven years from the effective date, with payments of $4,689.28 per month commencing in May 2024, with payments due the 15th day of each month thereafter. No payments will be made on the claim of Choice, during the first three months of the Plan, to allow for the availability of funds to pay administrative expense claims. The Debtor will present Choice with a promissory note for any sum still

due and owing, on or before February 15, 2029, with such sum to be amortized over an ensuing period of two years and with the Debtor being free to make early payments without penalty. An amortization schedule for the debt owed to Choice is attached hereto as **Exhibit C**.[6] A form of promissory note for Choice is attached hereto as **Exhibit D**.

Bank of the West is scheduled as having a secured claim in the amount of $15,738.62. This claim will be paid in the same exact manner as the claim of Choice: at 8% interest, over a period of seven years from the effective date, with payments of $257.09 per month commencing in May 2024. No payments will be made on the claim of Bank of the West, during the first three months of the Plan, to allow for the availability of funds to pay administrative expense claims. Bank of the West will retain its validly perfected lien on one of the Debtor's assets until such a time as the debt to Bank of the West is paid in full. The Debtor will present Choice with a promissory note for the sum still due and owing, on or before February 15, 2029, with such sum to be amortized over an ensuing period of two years and with the Debtor being free to make early payments without penalty. Should the Debtor

---

[6] Choice currently holds a separate debt instrument, on which the Debtor is not obligated, secured against a building occupied by the Debtor. The building is owned by an insider of the Debtor. The Debtor is not obligated (either directly or as a guarantor) on the building's mortgage, and the building's owner is not obligated (either directly or as a guarantor) on any of the Debtor's obligations to Choice. During the pendency of this case, the Debtor has made rent payments directly to Choice, to ensure satisfaction of the building owner's monthly mortgage payments. This practice will cease upon confirmation of this Plan, with the Debtor making payments to its landlord and the landlord, in turn, making mortgage payments to Choice.

make any such early payment, the note shall be reamortized. An amortization schedule for the debt owed to Bank of the West is attached hereto as **Exhibit E.** A form of promissory note for Bank of the West is attached hereto as **Exhibit F**.

The claims of Choice and Bank of the West will continue to be subject to their respective security agreements and liens (the "Security Instruments"), *except* any provision of said Security Instruments providing for a maturity date on the subject indebtedness, or calling for the Debtor's insolvency or seeking bankruptcy protection to be an event of default, shall be void and of no effect. Further, to the extent the Security Instruments conflict with this Plan, any order of this Honorable Court, or applicable bankruptcy law, the Plan and/or said order(s) and/or law shall control.

**DEFAULT.** Notwithstanding other provisions in this Plan, the following events shall constitute an event of default or default under the terms of this Plan as to Choice or Bank of the West:

- Any conversion of the present Chapter 11 bankruptcy to a Chapter 7 proceeding or any other chapter.

- Failure to make any payment to Choice or Bank of the West of principal or interest when due.

- Failure to comply with any of the covenants, conditions, or agreements contained in this Plan or any of the Security

12

Instruments (as modified by this Plan);

- Failure to discharge liens and encumbrances that impair or obtain priority ahead Choice's interests or Bank of the West's interests, as that priority existed on October 2, 2023, in the personal property that serves as collateral for Choice's claims and Bank of the West's claims.

- Dismissal of the current bankruptcy proceeding for any reason.

- The Debtor's cessation of business operations for any extended period of time that is not seasonably anticipated or coinciding with the occurrence of vacation time or a holiday.

**REMEDIES.** In the event of a default, Choice and Bank of the West shall have the following rights and remedies in addition to those specified in their respective loan documents (as modified herein), elsewhere in this Plan, and under applicable non-bankruptcy law: Choice and/or Bank of the West may submit a Default Motion (as more particularly described below) to obtain the entry of an order lifting the Automatic Stay of 11 U.S.C. § 362 in the following manner:

1. Counsel for Choice or Bank of the West shall serve both Debtor and Debtor's Counsel of record with written notice of the specific facts of the default (the Default Notice) which must state that Debtor may cure the default within seven (7)

calendar days of mailing the Default Notice and shall specifically provide the correct street address for mailing or delivering any delinquent payment or other necessary action to cure the default.

2. If Debtor fails to cure the default within ten (10) calendar days of receipt of the Default Notice, Counsel for Choice of Bank of the West may present to the court, after service on Debtor, Debtor's Counsel, and the United States Trustee, a motion, which must contain allegations of the specific facts of the default, a copy of the Default Notice, and a proposed order (the motion, copy of the Default Notice, and the proposed order are herein collectively referred to as the "Default Motion").

3. Upon filing the Default Motion, the Debtor is permitted five (5) business days to file a response to the Default Motion.

If there is no timely response filed to the Default Motion, the court may enter an order lifting the automatic stay as to Choice's collateral or Bank of the West's, without further hearing.

| | | |
|---|---|---|
| Class 3 – General unsecured claims, excluding DSI Investments, LLC but including the general unsecured claim of the IRS | Impaired | The Debtor will pay the allowed claims of Class 3 constituents, *pro rata*, the sum of $1,305.08 per month, commencing in May 2024, each month to and through October 2028. For the months of November and December 2028, as well as January 2029, the Debtor shall pay $2,541.63 (with these |

14

being months in which the Debtor will no longer be making payments to the IRS).

The Debtor will also establish a trust for the benefit of Class 3 creditors (the "Drain Services Class 3 Trust"). A form of trust agreement is attached hereto as **Exhibit G**. The Drain Services Class 3 Trust will be funded with a promissory note in the amount of $60,999.12 (the "Class 3 Note"). A form of promissory note is attached hereto as **Exhibit H**. The Class 3 Note will have a maturity date of January 15, 2031, with payments thereupon being amortized over the period of February 14, 2029 through January 15, 2031 and paid in a straight line manner during that two year period, without interest. This will result in additional payments of $2,541.63, each month, being made to Class 3 creditors during the two year period following the conclusion of the life of this Plan.

Additionally, should there come a time during the five year life of this Plan when the Debtor has an average operating account balance in excess of $75,000.00, as measured on a trailing 90 day basis, the Debtor will apply the difference between said balance and $75,000.00 to the making of early payments under this Plan (the "Cash Overflow Mechanism"). Said payments will be used to pay the allowed claims of Class 3 constituents, *pro rata*.

The foregoing notwithstanding, should there come a time, prior to January 15, 2029, when the Cash Overflow Mechanism results in the claims of Class 3 creditors being paid in full, the

sums otherwise due and owing to Class 3 creditors, under this Plan, shall instead be paid to Class 2 creditors, *pari passu* and the Debtor shall be relieved of its obligation to execute the Class 3 Note and/or to create the Drain Services Class 3 Trust.[8]

For purposes of measuring the trailing average balance of the Debtor's operating account, for purposes of the Cash Overflow Mechanism, the following rules shall apply: (i) the cumulative sums of all non-fiduciary accounts, held in the Debtor's name or for the benefit of the Debtor, shall be utilized; (ii) after any one distribution pursuant to this provision, no new measurement shall be taken for a period of 90 days; and (iii) should the Debtor be holding an unusual sum of money, as and for a customer's deposit (or pursuant to any other extenuating circumstance), the Debtor may petition this Honorable Court – with notice to all parties in interest – for leave to deviate from the rigors of this provision to the extent that honoring this payment regime would inflict material damage upon the Debtor's ability to conduct business on a forward-looking basis.

| | | |
|---|---|---|
| Class 4 – DSI Investments, LLC | Impaired | This insider class will take nothing under this Plan. |
| Class 5 – Equity interests in the Debtor | Unimpaired | Caitlyn Cameron shall retain her membership interest in the Debtor. |

---

[8] Similarly, if the Cash Overflow Mechanism creates a paradigm where the total unpaid claims of Class 3 creditors are less than $60,999.12 on the date of the making of the Class 3 Note, the face sum of the Class 3 Note shall be reduced to the amount then due and owing to Class 3 creditors, with the Class 3 Note being reamortized to reduce the Debtor's monthly payment obligation for the two year term of the Class 3 Note.

**Article 5.     Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Anticipated Disputed Claims**. The Debtor presently anticipates objecting to the claims of (i) Sewer Equipment Co. of America; and (ii) Tony Hamilton, reserving its right to object to other claims as the Debtor may deem fit. Any such claim objection must be filed by the Debtor within ninety (90) days from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within ninety (90) days of the date on which such claim is filed.

**Article 6.     Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes the unexpired lease set forth on line 2.1 of Schedule G (as found at DE #6 and being a month-to-month lease in favor of DSI Investments, Inc., an insider, for use of the facilities out of which the Debtor operates). The Debtor also assumes all executory contracts and unexpired leases for (i) the provision of utility services to any building occupied by the Debtor; (ii) the provision of utility services to the Debtor; (iii) the provision of merchant loyalty rewards, whether in the form of points, coupons, or otherwise, to the Debtor; (iv) the provision of insurance to the Debtor; and/or (v) the purchase of goods and/or services from the Debtor. To the extent the claim of the SBA may be construed as an executory contract, for purposes of preserving the interest rate set forth in the correlative promissory note, the Debtor assumes the same. To the extent the Debtor's agreements to perform work for any customers may be classified as executory contracts, the Debtor assumes the same.

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.     Means for Implementation of the Plan**

Commencing on the fifteenth calendar day of the first calendar month succeeding the effective date (or, should such date fall on a holiday or weekend, the first business day thereafter), the Debtor will make payments – pursuant to the terms of this Plan – in the sum of $10,050.00, each month, for 59 months. As set forth in greater detail in Articles 3 and 4, these monies will be first applied to the retirement of administrative expense claims and then applied to the retirement of secured claims and general unsecured claims, *except* part of the payment of the claim of the SBA will overlap with the payment of administrative expense claims.

As set forth in greater detail in the Article 4 treatment of Class 3, the Debtor will use the Cash Overflow Mechanism to apply any monies in its operating account, over and above the sum of $75,000.00 (measured on a trailing basis, as extrapolated upon *supra*) to the additional payment of general unsecured claims.

The primary means for implementing this Plan will be the Debtor's continued operation of its business, furnishing services and materials to municipal, corporate and residential customers throughout the Upper Midwest. The projections to be filed herein will set forth the revenues Drain Services reasonably anticipates receiving from such operations.

The Plan may also be funded through the Debtor's collection of monies on an insurance claim identified on Line 73 of Schedule A/B (as found at DE #51). Should such monies be received, they will be applied to a bulk Plan payment to Choice (the creditor holding the senior lien on the insurance claim). The monthly payment to Choice will be reamortized upon the making of such a bulk payment and any discount occasioned by such will result in a dollar-for-dollar increase of the Debtor's monthly payments to general unsecured creditors during the five year duration of this Plan.

The Debtor has also filed a claim against the bankruptcy estate of Kevin Cameron and Caitlyn Cameron, in the sum of $5,000.00. Any monies received pursuant to this claim will be treated as revenues of the Debtor and utilized for the making of ordinary payments under this Plan; no creditor holds a lien on this claim.

The Debtor will be free to make prepayments under this Plan. Should it do so, the amount paid early – whether as a freestanding payment or in addition to the full sum of a prior payment – shall be credited against the Debtor's next-scheduled payment hereunder. If a pre-payment is made and such prepayment is larger than the next scheduled payment, such prepayment shall be credited against ensuing payment obligations, in chronological order from the date of said prepayment, until the prepaid sum is exhausted.

**Article 8.    General Provisions**

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

18

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit. The Debtor may consult with counsel to ensure proper computation of the *pari passu* distributions owed to Class 3 claimants and other creditors.

**Section 8.07   Reporting.** Commencing on the first business day succeeding the fourteenth calendar day of April 2024, and continuing on the first business day succeeding the fourteenth calendar day following the close of each calendar quarter thereafter, to and through the fourth quarter of 2028, the Debtor shall cause to be filed, on the docket of this case, the most recent three months of statements from each bank or depository account in which the Debtor holds (or has held) any funds in excess of $1,000.00, *provided* the Debtor may redact the account numbers on each such statement.

**Section 8.08   Notice of Large Expenditures.** For the five year duration of this Plan, the Debtor may not undertake any single expenditure in a sum in excess of $30,000.00 without first (i) giving notice of such intended expenditure, on the docket of this case; and (ii) permitting five business days to elapse from the date of giving of such notice. The foregoing notwithstanding, should exigent or emergency circumstances not permit the giving of advanced notice (or the giving of five days' advanced notice), the Debtor shall nonetheless give notice as soon as may be practicable and shall explain, as part of said notice, what exigencies and/or emergencies prohibited the affording of this notice period.

**Section 8.09   Equity Draws and Salary.** For the five year duration of this Plan, the Debtor shall not issue any dividends, distributions, or other equity draws to its equity interest, nor shall the Debtor loan any monies to its equity interest. Any insider employed by the Debtor may not receive a raise, of more than 5% per annum, during the life of this Plan, without first obtaining leave of the Bankruptcy Court.

**Section 8.10   Financial Projections.** The forward-looking financial projections referenced in subsection (c) of the prefatory portion of this Plan are attached hereto as **Exhibit I**. Should the Debtor deviate from the gross annual budgeted expenditures set forth in these projections, by more than 10% in any one calendar year, such shall constitute an event of default hereunder.

**Section 8.11   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

19

**Section 8.12   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.13   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.14   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.15   Modifications.** The Debtor may, with the approval of the Bankruptcy Court and without notice to holders of claims, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable. The Debtor may also amend this Plan in any manner that renders the terms hereof *more* favorable to creditors, with the approval of the Bankruptcy Court and without notice to holders of claims.

**Article 9.   Discharge**

**Section 9.01   Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a)   If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made in January 2029.

**Section 9.02   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.      Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all rights arising under Chapter 5 of the Bankruptcy Code shall remain an asset of the Debtor's bankruptcy estate – and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code – to and through December 12, 2028, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

Respectfully Submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
mac@dakotabankruptcy.com
*Counsel for the Debtor*