IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-30352 |
| | ) | (Chapter 11) |
| DRAIN SERVICES INC. | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**OMNIBUS RESPONSE TO OBJECTIONS TO**
**CONFIRMATION OF AMENDED PLAN OF REORGANIZATION**

Comes now Drain Services Inc. ("Drain Services" or the "Debtor"), by and through undersigned counsel, and in response to (i) the Acting US Trustee Objections to Drain Services, Inc. Amended Subchapter V Plan (the "UST Objection," as found at DE #120) filed by the United States Trustee (the "US Trustee"); (ii) the Objection of Tony Hamilton to Debtor's Subchapter V Amended Plan of Reorganization (the "Hamilton Objection," as found at DE #121) filed by Tony Hamilton ("Mr. Hamilton"); and (iii) Choice Financial Group's Objection to Confirmation of Drain Services, Inc.'s Amended Subchapter V Plan of Reorganization (the "Choice Objection," as found at DE #122) filed by Choice Financial Group ("Choice") states as follows:

**I.    Introduction**

Drain Services has proposed a plan of reorganization (the "Plan," as found at DE #108) that goes well beyond what is statutorily required of a Subchapter V debtor. Openly eschewing the statutory mandate that a plan conclude within five years, the Debtor is proposing a stream of payments that will stretch two extra years, to ensure general unsecured creditors realize a healthy return and to avoid so much as an inference of the Debtor being able to pass profits to equity at the expense of creditors. Yet, disappointingly, the Plan has still fetched a stream of objections. With one exception, these filings – while well taken – are without substantive merit sufficient to deny

1

confirmation of the Plan. The lone exception (concerning the Plan's amendment clause) can – and should – be remedied by alteration in a confirmation order.

## II. Objection of the US Trustee

The UST Objection commences by joining in the objection of Thomas Kapusta, the Subchapter V trustee herein (the "Trustee"). Mr. Kapusta's objection has been addressed separately. *See* DE #115. Drain Services stands by the points made in its prior filing and, in particular, notes that the Trustee's objection (adopted by the UST) appears to pay insufficient attention to when administrative claims must be paid under Title 11 of the United States Code (the "Bankruptcy Code") and how the Debtor's cash position will permit payment once pre-confirmation adequate protection payments are no longer required.

The US Trustee next asserts that the Plan does not include adequate information about the confirmation process. Yet such is nowhere required in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. This is not a traditional Chapter 11 case where a disclosure statement is required and, to the contrary, Subchapter V cases are designed to be more streamlined in many regards, with thinner, easier-to-read plans. In fact, a Subchapter V plan is governed by Official Form 425A which, in turn, is the form that "shall" be used. *See* Fed. R. Bankr. P. 9009(a); Official Form 425A. The form, in turn, does not reference the difference between a consensual confirmation, and a non-consensual confirmation, except in the section thereof addressing discharge. *See* Official Form 425A at Art. 9. The Debtor, in this case, has used more precise language than required by the form (in fact, language suggested by the UST) to address how a consensual or non-consensual confirmation would impact discharge. *See* Plan at Art. 9.

It is not merely that the Plan complies with the rigors of Rule 9009 and Form 425A but, too, it is genuinely not clear what more the Debtor ought to offer to creditors by way of an

2

explanation. While the UST Objection goes on to suggest that the Debtor should furnish quarterly reports post-petition, such a rigor is also nowhere present in the Bankruptcy Code. Rather, the legal obligation is that the Debtor file a notice of substantial consummation at an appropriate time. 11 U.S.C. § 1183(c)(2). While ordinary Chapter 11 debtors are bound to file quarterly reports post-confirmation, the Code of Federal Regulations expressly exempts small business debtors from that onus. 28 C.F.R. § 58.8(a) ("The requirements of this section apply to all chapter 11 debtors who do not qualify as a 'small business debtor' under 11 U.S.C. 101(51D).").

Nonetheless, the Debtor has proposed that it file bank statements on a quarterly basis, offering greater visibility than is required by the Bankruptcy Code and offering greater insight into its post-confirmation affairs. And insofar as the Trustee will continue to serve if confirmation is non-consensual (something that appears to be *fait accompli* at this juncture), the Trustee will – as a matter of law – be required to ensure the Debtor makes plan payments. 11 U.S.C. § 1183(b)(4). So there very much is a reporting mechanism in place, being one greater than what is required by law to the point of being facially at odds with the Code of Federal Regulations. Much as the Debtor has offered to pay monies over seven years, in lieu of the five years that are a legislative cap, the Debtor has gone above and beyond here as well.

Similarly, the US Trustee urges that "[t]he Amended Plan should clearly define when the Subchapter V trustee services will be terminated." UST Objection, DE #120, at ¶ 5. Yet this need not be in the Plan because, as the US Trustee equally observes, this is provided for by law. If confirmation is consensual, the Trustee will be relieved of his charge upon substantial consummation; if not, he will continue to serve. 11 U.S.C. § 1183(c). While the Bankruptcy Code permits a plan to alter a trustee's role as disbursing agent, 11 U.S.C. § 1194(b), and the Debtor has availed itself of that option in this case (to which no party in interest has objected), the Bankruptcy

3

Code does not permit a debtor to prematurely terminate a trustee's services. So if confirmation is non-consensual, the Trustee will serve for the full five year duration of the Plan, as required by law.

The final objection of the US Trustee is that the Plan does not make clear "how unsecured creditors can enforce the Trust if the payments are not made." UST Objection, DE #120, at ¶ 6. Yet there are two problems with this argument. First, the trust mechanism springs at the end of the Plan's duration, being necessarily beyond the lawful temporal scope of the Plan. 11 U.S.C. § 1191(c)(2)(A). Second, and far more substantively, the creditors' rights are set forth by controlling law and thusly do not need to be expressly delineated in the trust. North Dakota law provides remedies for a breach of trust, N.D. Cent. Code § 59-18-01, delineates the damages available to a trust beneficiary in such a circumstance, N.D. Cent. Code § 59-18-02, and mandates a trustee "keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests," N.D. Cent. Code § 59-16-13(2)(a).

### III.     Objection of Mr. Hamilton

The Hamilton Objection overlaps with that of the US Trustee. Specifically, Mr. Hamilton also seeks a reporting regime at odds with the rigors of the Code of Federal Regulations and seeks to subject the Debtor to ongoing – and palpably expensive – quarterly accounting rigors that are not appropriate for a small business. Mr. Hamilton also cites the lack of a remedy provision in the trust, even though North Dakota law provides ample mandates and remedies that serve the identified purpose.

**IV.     Objection of Choice**

The Choice Objection is the most loquacious of the three. The Debtor and Choice certainly have a now-lengthy history, and it is one that has not always been positive, with this case being filed moments before Choice sought to freeze the Debtor's assets in state court and force Drain Services out of business to the detriment of all other creditors. The bank holds a first position lien and, as such, is perhaps the only creditor that would have nothing to lose if this case fell apart. But such is certainly not cause to deny confirmation and, to the contrary, Choice's arguments are generally unavailing in nature (with one exception).

Starting with the meritorious argument: Section 8.15 of the Plan should be amended, in the confirmation order, to prohibit any changes to the Plan without notice to all creditors. This was an error pointed out in the first iteration of the Plan and it is one that ought to have been corrected. The failure to make this correction was an oversight.

Vis a vis the other arguments, Choice first contends that the Debtor's prior failure to comply with the terms of an interim cash collateral order should, *ipso facto*, doom any prospects of confirmation. There is a pragmatic problem with this argument and a legal problem with this argument. First, on the pragmatic front, what Choice seemingly suggests is that any debtor that runs afoul of any provision of any order during the duration of any Chapter 11 case is, resultantly, forever prohibited (for the duration of the case, at least) from proposing and confirming a plan. Logically extrapolated, this argument would mean that any debtor filing a monthly operating report a week late, using cash collateral in the gap period between when a petition is filed and when first day hearings are held, or permitting a pre-petition check to clear hours after filing, would be without the ability to propose and confirm a plan. If accepted, this theory would assuredly result in far fewer Chapter 11 debtors clearing the proverbial finish line.

5

On a legal front, this argument also comes up short because it is a fundamental misconstruction of the Bankruptcy Code. Choice appears to premise this assertion on the mandate that "[t]he proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Yet this precise theory, after being embraced by at least one court in the early 1980s, has been roundly rejected when applied to violations of the Bankruptcy Code that (i) have been cured; and (ii) do not relate to material misstatements (or omissions) in a disclosure statement:

> . . . such a slavish interpretation of § 1129(a)(2) can lead to draconian results not intended by Congress. . . . Contrary to Bank United's interpretation of § 1129(a), Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express. For example, Congress could have enacted a provision in § 363 which automatically lifts the stay or dismisses the case if a debtor used cash collateral without authorization, but it did not.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess., p. 412 (1977)) (emphasis in original). *See also In re Moore & Moore Trucking, LLC*, 2022 WL 120189, at *5 (Bankr. E.D. La. Jan. 12, 2022) ("As explained above, the Court finds that those violations were brought to the Court pre-confirmation and fully cured; thus, the Court overrules Traylor's objection and concludes that the Debtor has satisfied § 1129(a)(2)."); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237 (Bankr. D.N.J. 2000) ("However, it must be noted that the potentially sanctionable conduct of Park Place did not alter the outcome of the voting process. The Class 4 general unsecured creditors voted overwhelmingly to support the High River plan. There was no practical effect of the conduct on the plan confirmation process. The violation will not result in a denial of the confirmability of the Park Place plan under §

1129(a)(2)."); *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("I recognize that not every violation of the Code should compel denial of confirmation.").[1]

Choice next suggests non-compliance with the current cash collateral order and a failure to adhere to rigors vis a vis engaging professionals. On the former point, the Debtor inadvertently failed to timely make the January payment but, as of the confirmation hearing, will have cured that oversight. On the latter point, Choice seems to suggest that the Debtor is using an accountant without leave of court. But the Debtor has simply been using a tax preparation firm (which, to be sure, employs plenty of people who are not "accountants" within the scope of Section 327) for payroll processing services. In this regard, Arrow Advisors has been no different than ADP or any of the other payroll vendors that are habitually utilized by debtors-in-possession as ordinary course purveyors of services for which leave of court is not required.

Choice next takes issue with the Debtor's projected disposable income providing for a cash reserve, alleging the Debtor's "projections indicate $338,692 in reserves/miscellaneous over the course of the Amended Plan." Choice Objection, DE #122, at p. 3. Yet the Plan expressly provides for a "Cash Overflow Mechanism," whereby funds held over and above $75,000.00 are paid over to creditors. And the Plan also provides for a trust to be created and endowed with a note for $60,999.12. *See* Plan, DE #108, at pp. 3, 15-16. Between these two implements, the most the Debtor could possibly hold in reserve monies not subsequently paid over to creditors, during the five year life of the Plan, is $14,000.88. *Id.* That is a far cry from the $338,692.00 suggested by

---

[1] Lest this citation be unintentionally deceptive, the debtor in *Lapworth* did have confirmation denied because "the violation has not been cured nor has it been disclosed in the court-approved Disclosure Statement upon which another similarly classified creditor relief…" *Id.* The citation is utilized to show that a single breach of a single order does not equate to mandated plan denial; the Debtor certainly appreciates that some violations of court orders and code provisions most certainly can beget denial of confirmation.

7

Choice and a sum certainly permissible as being necessary for the Debtor's "maintenance." 11 U.S.C. § 1191(d)(1)(A).

The next objection from Choice comes vis a vis the Plan's provision allowing the Debtor to re-amortize its monthly payments to Choice if a large insurance recovery is received and paid over to Choice. The bank suggests this "further shows that the Debtor will not be dedicating its projected disposable income to Plan payments." Choice Objection, DE #122, at p. 4. Yet that is simply not what the Plan provides. To the contrary, the Debtor has proposed:

> The Plan may also be funded through the Debtor's collection of monies on an insurance claim identified on Line 73 of Schedule A/B (as found at DE #51). Should such monies be received, they will be applied to a bulk Plan payment to Choice (the creditor holding the senior lien on the insurance claim). The monthly payment to Choice will be reamortized upon the making of such a bulk payment and **any discount occasioned by such will result in a dollar-for-dollar increase of the Debtor's monthly payments to general unsecured creditors during the five year duration of this Plan**.

Plan, DE #108, at Art. 7, p. 18 (emphasis added).

It is not that a re-amortization will permit the Debtor to shirk devoting its projected disposable income to payments; it is that a re-amortization will increase the payments to general unsecured creditors while decreasing the payments to Choice. The bank may not be in favor of this regime, as it does lessen the size of subsequent payments to the bank. But the Debtor, being sensitive to comments made and arguments advanced at the initial confirmation hearing, believes it essential to look out for general unsecured creditors (who, unlike Choice, do not hold a lien, are not getting paid in full, and are not receiving interest on their claims). This seems a proper, fair and equitable means of so doing.

Choice then proceeds to make a similar contention, arguing the Plan does not provide for the Debtor to commit its full disposable income. *See* Choice Objection, DE #122, at p. 4. Yet this contention seems to miss (i) the promissory notes being given at the end of the fifth year; (ii) the

8

payments being made to the SBA every month (to the tune of $2,562.00 per month); and (iii) the Debtor's strong desire to pay general unsecured creditors. Yes – the Debtor could pay Choice in five years if unsecured creditors did not receive anything. The Debtor tried that approach with its initial plan, Choice objected to that approach (albeit for other reasons), other parties objected to that approach, and confirmation was denied. So it would seem this case is now well past a point of trying to fashion a plan that prioritizes the prompt payment of Choice at the expense of general unsecured creditors, and the Debtor is candidly quite proud to have absorbed this feedback and found a way to ensure its unsecured creditors receive a meaningful distribution.

The ensuing section of Choice's objection, after making the argument concerning plan amendments (which the Debtor acknowledges to be meritorious and proposes to fix through a confirmation order), suggests the Debtor has inappropriately used cash collateral for the benefit of its principals. In so doing, Choice nitpicks the Debtor's financials and highlights seemingly every food purchase, despite the Debtor's prior testimony on this point. Drain Services' principal will be present at the confirmation hearing (either in person or via video conference) and can offer testimony as to these items. Suffice it to posit, however, that it is standard practice for a company to pay for workers' meals while on a job, and small dollar excursions aimed at building morale are a legitimate corporate expense.

Choice proceeds to urge the Plan is not feasible because the Debtor cannot meet its projections. This is a particularly difficult argument to credit, inasmuch as Choice – just pages prior – suggests the Debtor is not paying enough money under the Plan. But the Debtor's principal can address this contention, just as he did in discussing feasibility and projections at the last confirmation hearing, and appropriate evidence will be adduced.

9

Vis a vis Choice's ensuing contention that the bank is not adequately protected, the Debtor welcomes Choice to make an evidentiary showing of such. Choice is a first position lender that is being aggressively paid under the Plan. While assets will depreciate, the total debt owed to Choice will, too, wither over the span of several years. It would seem Choice's equity cushion is rather generous. And it is telling that neither the IRS nor the SBA – the two creditors with liens junior to that of Choice – have chosen to object to the Plan.

Finally, Choice suggests it does not retain its lien, 11 U.S.C. 1129(b)(2)(A), despite the Plan expressly providing that Choice retains its lien, Plan, DE #108, at Art. 4 ("The claims of Choice and Bank of the West will continue to be subject to their respective security agreements and liens. . ."). And, further, Choice argues that its claim is growing ever larger because attorneys' fees are accruing. The Debtor can only budget for the claims that are filed, and the Debtor has done so with Choice's claim, providing a detailed amortization schedule with interest. If the Debtor needs to increase the note being given to Choice, to cover any additional fees, the Debtor can do so. But attorneys' fees are always a moving target, being incurred literally through a confirmation hearing; if Choice is suggesting the Debtor must know exactly how much those fees will ultimately be, and budget for an as-yet-unknown quantity, it would seem Choice is asking the Debtor to undertake the impossible.

To be sure, it is in Choice's interest for this case to be converted or dismissed. A liquidation will pay Choice first and will do so promptly. A dismissal will likely invite Choice's seizure of the Debtor's full asset base in state court. And Choice – consistent with its fiduciary charge to its own shareholders and depositors – does not (and ought not) much care if other creditors are paid, if the Debtor survives, or if a niche regional plumbing market crumbles. But those are not the interests

that guide the confirmation process, as the Debtor owes its duty to *all* creditors. This is a plan that looks out for all creditors. This is a sensible plan. And this is a plan that merits confirmation.

V.     **Conclusion**

WHEREFORE, Drain Services respectfully prays this Honorable Court (i) confirm the Amended Plan, solely amending Section 8.15 in the confirmation order; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: January 25, 2024     By:     /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of January, 2024, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

11